In re T. H. BUNCH CO.

(District Court, E. D. Arkansas, W. D. June 23, 1910.)

No. 1,167.

1. CONTRACTS (§ 138*)—ILLEGAL TRANSACTION—RELIEF.

If plaintiff does not require the aid of an illegal transaction to establish his claim, he may recover if defendant has possession of a thing of value belonging to plaintiff, though an illegal transaction was involved therein.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

2. BANKRUPTCY (§ 314*)—CLAIMS PROVABLE.

Kirby's Dig. Ark. § 530, provides that no property transported by a carrier shall be delivered except on surrender and cancellation of the bills of lading. A carrier delivered grain without requiring surrender of such bills of lading, and the consignee deposited some of the bills as collateral security for loans, and some of them were held by the original vendors when the consignee became bankrupt. The carrier took assignments of the drafts secured by the bills of lading, and open accounts, and bills of lading owned by the original vendors, and procured the bills of lading. Held that, though the carrier had violated the statute, it could recover against the bankrupt's trustee on the assignments.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

3. CONTRACTS (§ 136*)—VALIDITY—ACTS "MALUM IN SE" AND "MALA PROHIBITUM."

A distinction is made between acts "malum in se," which are generally regarded as absolutely void in the sense that no right or claim can be derived from them, and acts which are "mala prohibitum," which are void or voidable, according to the nature of the thing prohibited.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 136.*

For other definitions, see Words and Phrases, vol. 5, p. 4296; vol. 5, p. 4315.]

4. STATUTES (§ 241*)—CONSTRUCTION—VALIDITY OF CONTRACT.

When a statute imposes specific penalties for its violation, where the act is not malum in se, and the purpose of the statute can be accomplished without declaring contracts in violation thereof illegal, the inference is

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that it was not the legislative intent to render such contracts illegal and unenforceable, and the court must examine the entire statute to discover whether the Legislature intended to prevent courts from enforcing contracts based on the act prohibited, and, unless it does so appear, only the penalties imposed by the statute can be enforced.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 322, 323; Dec. Dig. § 241.*]

5. CARRIERS (§ 20*)—CARRIAGE OF GOODS—DELIVERY WITHOUT SURRENDER OF BILL OF LADING—PENALTY—STATUTORY PROVISIONS.

Kirby's Dig. Ark. § 530, provides that no property deposited for which bills of lading have been issued shall be delivered up by a carrier, except on surrender and cancellation of such bills of lading. Section 531 provides that any person violating the provisions of the act shall be deemed guilty of a crime, and upon conviction fined, not exceeding $5,000, or imprisoned in the penitentiary not exceeding five years, or both, and also provides a liability in a civil action for all damages sustained by the owner of the bill of lading. Held, that it was not the legislative intent to impose upon a carrier delivering goods to a consignee without surrender or cancellation of the bill of lading, in addition to the fine and civil liability, the further penalty of being prohibited from collecting the value of the goods illegally delivered and converted to the consignee's own use.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 20.*]

In the matter of the T. H. Bunch Company, bankrupt. On petition for review of allowance by the referee of a claim of the Chicago, Rock Island & Pacific Railway Company. Action of referee approved.

As some of the claims are not questioned, it is only necessary to state the facts bearing upon the disputed claims, amounting to $205,767.53. The claim as originally presented stated that the railway company is a common carrier engaged in the transportation of freight in and through the state of Arkansas and other states; that the bankrupt, which was engaged in the city of Little Rock in the grain and produce business, procured from said railway company the delivery of a large number of cars of corn, oats, hay, and other grain and merchandise which had been consigned by the shippers thereof to shippers' order, and which were surrendered and delivered by the railway company to the bankrupt without surrender of the bills of lading, whereby the railway company had been compelled to pay to the holders and owners of bills of lading the sums of money now claimed; that the said bills of lading had been hypothecated by the bankrupt as collateral security to certain notes and accepted drafts, and upon payment by the railway company to the holders of the bills of lading these notes and accepted drafts were assigned to it. About $35,000 of this amount was paid to the original vendors, who had not parted with the bills of lading, and they assigned these bills of lading to the railway company. The various notes, accepted drafts, and accounts are fully set out in the proof of claim, and it is unnecessary to set them out in this statement of facts. The assignments made by the holders of the notes and accepted drafts were in the following form:

After reciting the facts as above stated and describing the bills of lading and acknowledging the receipt of the payment, they proceed as follows:

"In consideration of this payment the Chicago, Rock Island & Pacific Railway Company is hereby released from all liability on account of said bills of lading and all the interest of this bank in the aforesaid notes to the amount of $——— (naming the amount paid to it) is hereby transferred and assigned to the said Chicago, Rock Island & Pacific Railway Company, and the said railway company is hereby authorized to collect the same from the said T. H. Bunch Company or its receivers, successors or assigns, and to use the name of this bank in filing suit or taking legal steps to make the said collection, it being understood, however, that all such proceedings are to be at the sole cost and expense of said railway company."

The form of the assignments made by the vendors who had not parted with the bills of lading which were made to shippers' order was as follows:

"Received of the Chicago, Rock Island & Pacific Railway Company the sum of $———— (naming the amount due that vendor) in full settlement of claims against said company for failure to deliver car (describing the car) in accordance with shippers' order bill of lading issued therefor. In consideration of this settlement the said bill of lading is hereby assigned to the said Chicago, Rock Island & Pacific Railway Company."

To these claims the trustee and the W. B. Worthen Company, a creditor of the bankrupt, filed objections. The objections, briefly stated, are that the statements set out by the railway company in its proof of claim and the accompanying exhibits in reference to said payments do not entitle it to be subrogated to the debt or demand originally owing by said bankrupt to the banks or shippers; that they do not constitute a just, valid, and provable debt, claim, or demand owing from said bankrupt to the railway company for the reason that said sums of money were paid to said banks by the railway company to obtain its release from a liability it had incurred to them by its own unlawful act in wrongfully delivering to said bankrupt shipments for which it had issued negotiable bills of lading which had thereafter been hypothecated by the bankrupt to the holders thereof as collateral security to certain notes and accepted drafts; that by said payments the railway company obtained a release from such liability; that these payments were made by the railway company to obtain its release from a liability it had incurred by violation of the criminal laws of the state of Arkansas, and were in full settlement of the claims against said railway company held by the holders of the bills of lading.

After these objections were filed, the railway company, by leave of the referee, filed a new and amended proof of claim, in which it claims as assignee and owner of the notes and accepted drafts of the bankrupt by assignments made to it by the owners thereof. These assignments are in the following form, so far as the notes and accepted bills are affected:

After reciting the receipt of the money from the railway company and describing the bills of lading, it proceeds:

"In consideration of this payment the Chicago, Rock Island & Pacific Railway Company is hereby released from all liability on account of said bills of lading, and all the interest of this bank in the aforesaid notes (which are described) is hereby transferred and assigned to the said Chicago, Rock Island & Pacific Railway Company, and the said Chicago, Rock Island & Pacific Railway Company is hereby authorized to collect the same from the said T. H. Bunch Company, its receivers, successors or assigns, and to use the name of this bank in filing suit or taking legal steps to make the said collection, it being understood, however, that all such proceedings are to be at the sole cost and expense of the railway company."

The open accounts and bills of lading still owned by the original vendors were assigned as follows:

After acknowledging the receipt of the money, it proceeds: "In consideration of this payment all of our interest in the said above-named car and in bill of lading covering said car, and in the account above mentioned, is hereby sold and assigned and transferred to the said Chicago, Rock Island & Pacific Railway Company, its successors and assigns"—and then authorizes the railway company to collect the same in the same manner as in the other assignments.

This amended proof was filed on May 19, 1910. The same objections were filed by the trustee and the creditor as were filed to the original, and the further objection made that the original assignment as set out in the original proof of claim was only a release of the liability of the railway company to the holders of the bills of lading, and not an assignment of the indebtedness secured by said bills of lading, and that the assignments mentioned in the amended complaint were not made until after objections had been filed to the allowance of the original claim, and that the assignments were dated back to the date when the payments were made for the purpose of avoiding the defense set up in the objection to the allowance of the claim.

The statutes alleged to have been violated were enacted in 1887 and are

digested as chapter 15 of Kirby's Digest. So far as applicable to the issues involved herein, they are as follows:

"Sec. 528. No master, owner or agent of any boat or vessel of any description, forwarder or officer or agent of any railroad, transfer or transportation company, or other person shall sign or give away any bill of lading, receipt or other voucher or document for any merchandise or property by which it shall appear that such merchandise or property has been shipped on board of any boat, vessel, railroad car or other vehicle, unless the same shall have been actually shipped and put on board, and shall be at the time actually on board or delivered to such boat, vessel, car or other vehicle, or to the owner or owners thereof, or his or their agent or agents, to be carried and conveyed as expressed in such bill of lading, receipt or other voucher or document.

"Sec. 529. All receipts issued or given by any warehouseman, wharfinger or other person or firm, and all bills of lading, transportation receipts and contracts of affreightment issued or given by any person, boat, railroad, transportation or transfer company for goods, wares, merchandise, cotton, grain, flour or other produce or commodity, shall be and are hereby made negotiable by written indorsement thereon, and delivery in the same manner as bills of exchange and promissory notes; and no printed or written conditions, clauses or provisions inserted in or attached to any such receipts, bills of lading or contracts shall in any way limit the negotiability, or affect any negotiation thereof, nor in any manner impair the right and duties of the parties thereto, or persons interested therein; and every such condition, clause or provision purporting to limit or affect the rights, duties or liabilities created or declared in this act shall be void and of no force or effect.

"Sec. 530. Warehouse receipts given by any warehouseman, wharfinger or other person or firm for any goods, wares, merchandise, cotton, grain, flour or other produce or commodity, stored or deposited, and all bills of lading and transportation receipts of every kind given by any carrier, boat, vessel, railroad, transportation or transfer company, may be transferred by indorsement in writing thereon, and the delivery thereof so indorsed, and any and all persons to whom the same may be transferred shall be deemed and held to be the owner of such goods, wares, merchandise, cotton, grain, flour or other produce or commodity, so far as to give validity to any pledge, lien or transfer given, made or created thereby, as on the faith thereof, and no property so stored or deposited, as specified in such bills of lading or receipts, shall be delivered except on surrender and cancellation of such receipts and bills of lading; provided, that all such receipts and bills of lading which shall have the words, 'Not negotiable,' plainly written or stamped on the face thereof, shall be exempt from the provisions of this act.

"Sec. 531. Any warehouseman, wharfinger, forwarder or other person who shall violate any of the provisions of this act shall be deemed guilty of a criminal offense, and upon indictment and conviction shall be fined in any sum not exceeding five thousand dollars, or imprisoned in the penitentiary of this state not exceeding five years, or both; and all and every person or persons aggrieved by the violation of any of the provisions of this act may have and maintain an action at law against the person or persons, corporation or corporations violating any of the provisions of this act, to recover all damages which he or they may have sustained by reason of any such violation as aforesaid, before any court of competent jurisdiction, whether such person or persons shall have been convicted of fraud as aforesaid under this act or not.

"Sec. 532. All the provisions of this act shall apply to bills of lading, and to all persons or corporations, their agents or servants, that shall or may issue bills of lading of any kind or description, the same as if the words 'forwarder' and 'bills of lading' were mentioned in every section of said act."

By an act approved May 23, 1907, this statute was amended as follows:

"Section 1. That it shall be lawful for a shipper or consignee of goods to make, execute and deliver to, and the carrier to take and receive a good, sufficient and valid bond in a sum double the value of the goods, conditioned that, the shipper or consignee shall within a reasonable time thereafter, deliver to the carrier the original receipts and bills of lading issued for said

goods or shall pay the value of said goods to the carrier upon demand; and upon the execution and delivery of said good, sufficient and valid bond as aforesaid, it shall be lawful for the carrier to deliver up the said goods to the shipper or consignee, without requiring the immediate surrender of said original bills of lading and receipts and for so doing the carrier shall not incur the penalty of the law as set forth in chapter 15 of Kirby's Digest." Sess. Acts Ark. 1907, p. 861.

The facts are practically undisputed, and the court finds them as follows:

That the railway company is a common carrier, as alleged in the proof of claim, and that the bankrupt was engaged in the grain and produce business in the city of Little Rock; that said bankrupt made its purchases in large lots in Kansas, Nebraska, Missouri, and other western states. These purchases of grain would be shipped over the railway's line to Little Rock, and bills of lading issued by it to the vendor consigned to the shipper's order. The shipper, who was also the vendor, would then draw on the bankrupt for the purchase price of the shipment, attaching the draft to the bill of lading, which was indorsed by the shipper, with directions to deliver to the bankrupt upon payment of the draft. Most of these drafts were sold by the shippers to various banks who sent them to banks at Little Rock for collection. The bankrupt would either pay these drafts with loans obtained from local banks executing its notes and leaving the bills of lading as collateral security, or accept the drafts in order that the local banks could remit for them and carry them as loans to the bankrupt with the bill of lading as security. Shipments to the value of $35,000 were made in the same manner, but the drafts were not negotiated by the vendors; they retaining the same. The business of the railway company with the bankrupt being very extensive, and the shipments frequently reaching Little Rock before the arrival of the drafts with the bills of lading attached, the bankrupt and railway company agreed that, if the bankrupt would execute to the railway company a bond in the sum of $25,000 to secure it for shipments delivered without surrender of the bills of lading, shipments to the value of that sum would be delivered to it without the surrender of the bills of lading, which were to be surrendered as soon as they arrived and were taken up by the bankrupt. The local agent of the railway company, who had positive instructions not to make deliveries of shipments without the surrender of the bills of lading exceeding in value the amount of the bond, made them largely in excess of the bond, relying upon the bankrupt's assurance that the bills of lading were in its possession and would be delivered to him at later dates; the excuse being that the grain was needed at once for reshipment, and that the bills of lading, although in possession of the bankrupt, would have to be entered on its books and checked off, which caused a delay.

At one time, the agent testified, when he called for bills of lading, the president of the bankrupt corporation showed him a large number of the bills of lading then in its safe, but which had not been checked off, and for that reason not delivered to him. When the grain company became insolvent, it was found that bills of lading for shipments delivered to the bankrupt in excess of the bond were held by banks as collateral or loans as above set forth, and some were held by the original vendors, amounting to the sum now in dispute. The railway company paid these claims off in October, 1909, shortly after the insolvency proceedings had been begun, taking the assignments as set out in the original proof of claim. After the objections had been made by the trustee and creditor, they procured the assignments set out in the amended proof of claim, antedating them so as to correspond with the dates the payments were made by it. The amounts claimed by it are justly owing by the bankrupt on its notes and accepted bills and open accounts of the vendors.

Thos. S. Buzbee, for railway company.
Rose, Hemingway, Cantrell & Loughborough, for trustee.
W. L. & D. D. Terry, for W. B. Worthen Co.

TRIEBER, District Judge (after stating the facts as above). The conclusions reached by the court upon the main issue involved here-

in make it unnecessary to determine whether the act of May 23, 1907, authorizes the carrier to deliver goods to the consignee without the surrender of the bills of lading, without taking a bond in double the value of the shipment as provided by that amendatory act, but solely on the credit of the consignee; the carrier assuming the risk of collecting from him the value of the shipment if obliged to pay therefor to one to whom the bill of lading had been assigned for value. We will, therefore, dispose of the case as if the act of 1887 had not been amended, but is still in full force as originally enacted, except as it may become necessary to refer to it for the purpose of ascertaining the intent of the Legislature in enacting these statutes.

On behalf of the trustee, it is claimed that as this statute forbids a carrier to deliver goods without a surrender or cancellation of the bill of lading, and makes a violation of this provision of the statute a crime, public policy requires that the claim of the railway company should be disallowed, as it is for the value of grain shipped over its line and delivered to the bankrupt without surrender of the bill of lading; the assignments of the notes and bills and open accounts secured by the bills of lading being made solely for the purpose of enabling it to make this claim.

As the amended petition takes the place of the original, it is unnecessary to refer to the original except for the purpose of ascertaining the good faith of the railway company in making this claim. The claim of the railway company as set out in its amended proof of claim is not to recover in its own right the value of the grain wrongfully delivered to the bankrupt and by it converted; but it seeks to recover as assignee and owner of the notes and accepted bills of the bankrupt and of the accounts of the original vendors. It is not denied that its assignors could successfully maintain an action against the bankrupt on these claims; but it is earnestly urged that, the railway company having violated the statute, it is therefore outlawed, and cannot recover, although the banks or any other assignee or holder of them could have done so.

In National Bank & Loan Co. v. Petrie, 189 U. S. 423, 425, 23 Sup. Ct. 512, 47 L. Ed. 879, a similar contention was made, but the court refused to sustain it, saying:

"A person does not become an outlaw and lose all rights by doing an illegal act."

The law is well settled that, if the plaintiff does not require the aid of an illegal transaction to establish his claim, he may recover if the defendant has possession of a thing of value belonging to plaintiff. As stated in Dent v. Ferguson, 132 U. S. 50, 10 Sup. Ct. 13, 33 L. Ed. 342:

"A new contract founded on a new and independent consideration, if fair and lawful, although in relation to property respecting which there had been unlawful or fraudulent transactions between the parties, will be determined by the courts on its own merits; and if the new consideration be valid and adequate it will be enforced."

To the same effect are Planters' Bank v. Union Bank, 16 Wall. 483, 500, 21 L. Ed. 473; Armstrong v. American Exchange Bank, 133

U. S. 433, 469, 10 Sup. Ct. 450, 33 L. Ed. 747. And this is the rule established by the Supreme Court of this state in a number of cases. In Martin v. Hodge, 47 Ark. 378, 384, 1 S. W. 694, 696, 58 Am. Rep. 763, it was said:

"The test of illegality to determine whether plaintiff is entitled to recover is his ability to establish his cause of action without aid from an illegal transaction."

To the same effect is Burks v. Harris, 91 Ark. 205, 208, 120 S. W. 979, 23 L. R. A. (N. S.) 626.

Under the Constitution and laws of this state a usurious contract is wholly void, the penalty imposed being a forfeiture of the principal as well as the interest; but it has been uniformly held by the Supreme Court that a surrender of a valid security not tainted by usury for a security invalid for usury is not a satisfaction and will not bar a recovery on the original valid debt or security. Humphrey v. Mc-Cauley, 55 Ark. 143, 17 S. W. 713; Tillman v. Thatcher, 56 Ark. 334, 19 S. W. 968; Johnson v. Hull, 57 Ark. 550, 22 S. W. 176.

In the last-cited case the original agreement was not usurious, but by a subsequent agreement a usurious rate of interest was agreed upon. In an action on the original agreement the second usurious agreement was pleaded. The court, in overruling it, said:

"Plaintiff is under no necessity of relying upon either the note or mortgage in which the excessive interest is stipulated for, and his claim is founded upon a contract clearly separable from both of these writings."

It is also insisted that the railway company and the bankrupt are joint tort-feasors, and that, as one joint tort-feasor cannot recover from another, the assignment of the claims to the railway company is but an indirect method to enable one joint tort-feasor to collect from the other. The statement of law is correct, but the premises are not. The liability of the railway company to the owners of the bills of lading may well be based on its contract to carry and deliver the goods to the holder of the bill of lading, and its failure to do so is a breach of that contract. It may be that an action of trover might also lie and the act of the railway company treated as a conversion; but, looking at the facts in this case, it is clear that there was no conversion of the goods by the railway company, but merely a breach of contract.

Upon the undisputed facts in this case no one will question the fact that these claims could have been enforced by the banks or their assigns against the bankrupt as the maker and acceptor of the notes and bills without any aid from the bills of lading, for there is no claim that they were executed without a valid and good consideration. The railway company, as assignee and owner of them, can establish its cause of action without aid from any illegal transaction. Assuming that it could not recover in an action based upon an implied promise to pay for the grain delivered in violation of the statute and then converted by the bankrupt, the law does not prevent a recovery on such claims which, if presented by the original creditor or any other assignee than the railway company, would be allowed as valid without question, because in a transaction wholly independent of these evidences of indebtedness, and which was not a part of the consideration

moving the bankrupt to execute them, it had been guilty of a violation of a criminal statute.

A similar question arose under the statutes of New York, which are very much like the Arkansas statute, and upon facts but slightly different from those established in the case at bar. Burnham v. Cape Vincent Seed Co., 142 N. Y. 169, 172, 36 N. E. 889. There the warehouseman had permitted the consignee, after he had accepted a draft to which the bill of lading was attached, to remove the goods without surrender of the bill of lading. Thereupon the bank, the holder of the draft and bill of lading, demanded the goods, and the warehouseman, being unable to deliver them, paid the draft, taking an assignment thereof and a surrender of the bill of lading. In an action against the seed company, who had wrongfully obtained possession of the goods, the plea was interposed that the warehouseman had parted with the goods in violation of section 633 of the Penal Code of that state, which is almost identical with section 531, Kirby's Dig.; but the plea was overruled, the court saying:

"The defense based on plaintiff's alleged violation of section 633 of the Penal Code has no foundation in fact or in law. The section referred to is designed to protect bona fide holders of negotiable warehouse receipts, by inflicting a severe penalty on warehousemen who wrongfully deliver to third parties articles covered by the receipt. In the case at bar the plaintiff held the cargo of peas as security from the Ontario bank, and if, before the bank's debt was paid, he had wrongfully delivered it to the defendant, he would have been criminally liable under section 633 of the Penal Code, and the bank could have proceeded against him in a civil action for damages. The facts in this case show that the section quoted has no application. The plaintiff, before this action was commenced, had paid the claim of the Ontario bank and was subrogated to all its rights as against the defendant; his cause of action was on the draft, although inartificially pleaded; the defendant, by the verdict of the jury, is found to have received the cargo which was covered by the warehouse receipt held by the bank, and there is no reason in morals or in law why it should not pay the draft accepted in payment of property it has reduced to possession."

These statutes of Arkansas, although never construed by the Supreme Court of the state on the particular point now involved, have received construction as to its intent in two well-considered cases. Martin v. Railway Co., 55 Ark. 510, 524, 19 S. W. 314; Nebraska Meal Mills v. Railway Co., 64 Ark. 169, 173, 41 S. W. 810, 38 L. R. A. 358, 62 Am. St. Rep. 183.

In the first-cited case the court said:

"The act was passed to protect bona fide holders of the receipts of warehousemen and bills of lading of carriers. * * * The main object of the act is to fix the liability of warehousemen, common carriers, and other persons named in the act, to the holders of their receipts or bills of lading. To do this it prohibits them from issuing the same, except for property in their actual possession, and from selling or incumbering, shipping or transferring, or permitting to be shipped, transferred, or removed beyond their control, the property for which a receipt or bill of lading has been given without the written assent of the person or persons holding such receipt or bill of lading. Their liability for a violation of the act is limited to the persons aggrieved, who are the persons interested in the property described in the receipt or bill of lading. It does not undertake to define the duties and liabilities of the warehousemen, carriers, and other persons named therein, to third persons, and does not change their rights, relations, duties, or liabilities to such persons; but leaves them as they were before its enactment."

In the last-cited case, the railway company had delivered some goods to the consignee without surrender of the bill of lading which the seller had retained and intended not to be delivered until the purchase money for which a draft had been drawn on the consignees, and which was attached to the bill of lading, had been paid. As the bill of lading was directed to the consignee and not to shipper's order, the railroad company delivered the goods to him without surrender of the bill of lading. Thereupon the consignor, the holder of the bill of lading, sued the carrier for the value of the goods, the consignee, being insolvent, insisting that the surrender of the goods in violation of this statute made it liable, but the court refused to sustain this contention, and held that:

"The purpose of the statute was to protect persons not parties to the bill of lading originally, but who for a valuable consideration acquired an interest in the property represented by it through the transfer of the bill of lading to them."

2. Does this statute prevent a recovery by the carrier of the value of property delivered in violation thereof and by the receiver converted to his own use? While there is some conflict among the decisions of the state courts as to the effect of an act not malum in se but only malum prohibitum, the decisions of the national courts are practically unanimous that there is an important distinction. United States v. Bradley, 10 Pet. 343, 360, 9 L. Ed. 448; Spring Company v. Knowlton, 103 U. S. 49, 26 L. Ed. 347; Ewell v. Daggs, 108 U. S. 143, 150, 2 Sup. Ct. 408, 27 L. Ed. 682; Dunlop v. Mercer, 156 Fed. 545, 555, 86 C. C. A. 435.

In Ewell v. Daggs the court said:

"A distinction is made between acts which are mala in se, which are generally regarded as absolutely void in the sense that no right or claim can be derived from them, and acts which are mala prohibitum, which are void or voidable according to the nature of the thing prohibited."

There is another equally well settled rule of law so far as the national courts are concerned. When a statute imposes specific penalties for its violation, where the act is not malum in se, and the purpose of the statute can be accomplished without declaring contracts in violation thereof illegal, the inference is that it was not the intention of the lawmakers to render such contracts illegal and unenforceable. Harris v. Runnels, 12 How. 79, 13 L. Ed. 901; Farmers', etc., Nat. Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196; National Bank v. Matthews, 98 U. S. 621, 629, 25 L. Ed. 188; Barnet v. National Bank, 98 U. S. 555, 25 L. Ed. 212; Louisiana v. Wood, 102 U. S. 294, 298, 26 L. Ed. 153; Fritts v. Palmer, 132 U. S. 282, 289, 293, 10 Sup. Ct. 93, 33 L. Ed. 317; Central Transportation Co. v. Pullman Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 35 L. Ed. 55; Logan County Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; Merchants' Cotton Press Co. v. Insurance Co., 151 U. S. 368, 388, 14 Sup. Ct. 367, 38 L. Ed. 195; Pullman Co. v. Central Transportation Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108; Connoly v. Union Sewer Pipe Co., 184 U. S. 540, 545, 22 Sup. Ct. 431, 46 L. Ed. 679; Yates v. Jones National Bank, 206 U. S. 158, 179, 27 Sup. Ct. 638, 51 L. Ed. 1002;

Hanover National Bank v. First National Bank, 109 Fed. 421, 426, 48 C. C. A. 482, 487; Dunlop v. Mercer, supra; Boatman's Bank v. Fritzlen (C. C.) 175 Fed. 183.

The rule to be deduced from these authorities is that, when such a plea of illegality is set up, the court must examine the entire statute in order to discover whether or not the Legislature intended to prevent courts of justice from enforcing contracts based on the act prohibited, and unless it does so appear only the penalties imposed by that statute can be enforced. A reference to a few of the leading cases on that subject will show how well settled this rule is in the courts of the United States.

In Harris v. Runnels the plea in bar to an action on a note was that "the consideration was the purchase of a slave imported into the state of Mississippi, which the statute prohibited." The only penalty provided in the statute was a fine on the seller and purchaser, and it was held that, the context of the statute showing no other penalty was intended, the plea was bad.

The national banking act prohibits these banks from making loans secured by real estate. In National Bank v. Matthews it was sought to foreclose a mortgage taken by a national bank in violation of the statute, and this statutory prohibition was pleaded as a defense. The Supreme Court of Missouri sustained the plea. On error the Supreme Court of the United States reversed that decision and held that from an examination of the entire statute it did not appear that Congress intended to declare a contract made in violation of the statute void, and the bank was entitled to a foreclosure of the mortgage.

In Barnet v. National Bank a like construction was given to that part of the national banking act prohibiting usurious contracts, and this has been uniformly followed by all courts ever since.

In Fritts v. Palmer a conveyance of land made to a foreign corporation prohibited under a penalty from doing business in the state of Colorado was sought to be set aside by the vendor; but the court held the deed passed a valid title to the corporation, basing its decision upon the ground that, as the statute imposed a penalty and did not declare that contracts and deeds in violation thereof were void, it indicated that the Legislature did not intend to make them so.

In Marsh v. Fulton County, 10 Wall. 676, 684, 19 L. Ed. 1040, it was said:

"The obligation to do justice rests upon all persons, natural and artificial, and, if a county obtains the property or money of others without authority, the law, independent of any statute, will compel a restitution or compensation."

In Central Transportation Co. v. Pullman Company, the court said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to

do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

In Connoly v. Union Sewer Pipe Co. this question is again fully discussed, and the broad rule laid down:

"Assuming, as defendants contend, that the alleged combination was illegal if tested by the principles of the common law, still it would not follow that they could, at common law, refuse to pay for pipe bought by them under special contracts with the plaintiff. The illegality of such combination did not prevent the plaintiff corporation from selling pipe that it obtained from its constituent companies or either of them. It could pass a title by a sale to any one desiring to buy, and the buyer could not justify a refusal to pay for what he bought and received by proving that the seller had previously, in the prosecution of its business, entered into an illegal combination with others in reference generally to the sale of Akron pipe."

In Merchants' Cotton Press Co. v. Insurance Company the validity of bills of lading was attacked upon the ground that rebates and drawbacks had been granted to the shipper; but Mr. Justice Jackson, speaking for the court, quotes with approval the following excerpt from the decision of the Supreme Court of Tennesssee in that case:

"This fact of special rate and rebate is denied, and it is a matter of controversy and conflict of evidence. * * * We are of opinion, however, and rest our decision upon the ground, that if it were assumed that the law was applicable, and the fact of agreement for rebate and special rate proven, it would not prevent liability on the part of the carrier for the freight received and covered by insurance in the hands of the carrier's agent. The law makes such agreements as to rebate, etc., void, but does not make the contract of affreightment otherwise void, and we think there is nothing in the law or the policy of it which requires a construction that would excuse a carrier from all liability when it made such a contract in connection with that for receipt and transportation of freight. Such a construction would encourage rather than discourage such unlawful agreements for rebates. The carrier might prefer them to liability for the freight. Such a contract for rebate would be void, and could not be enforced; but we think the shipper could nevertheless recover for loss of his freight through the carrier's and insurer's negligence. No different construction has yet been put upon the interstate commerce law so far as we are advised, and we decline to give it any other."

In Yates v. Jones National Bank it was held that:

"The civil liability of national bank directors, then, in respect to the making and publishing of the official reports of the condition of the bank, a duty solely enjoined by the statute, being governed by the national banking act, it is self-evident that the rule expressed by the statute is exclusive, because of the elementary principle that, where a statute creates a duty and prescribes a penalty for nonperformance, the rule prescribed by the statute is the exclusive test of liability."

The latest decisions of the Supreme Court on that subject are Citizens' Central National Bank v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. ——, and Earling v. Eneigh (opinion filed May 31, 1910, and not yet officially reported) 30 Sup. Ct. 672, 54 L. Ed. ——.

In the Appleton Case it was sought to recover money loaned by the Cooper Exchange Bank, of which Appleton became receiver, to a debtor of the Citizens' Bank, to be used for the purpose of paying that debt, and the money was so applied; the Citizens' Bank guaranteeing to the Cooper Exchange Bank the payment of the loan. The plea of illegality and ultra vires was set up in bar to this action; but the

180 F.—34

court held that, although the guaranty was ultra vires, and therefore illegal, as the bank had received the money, it was liable on the implied contract which made it its duty to account to the Cooper Exchange Bank for the money advanced by the latter in execution of the agreement made by the former with the borrower. The court, speaking by Mr. Justice Harlan, said:

"Whatever may be said as to the validity of the written guaranty now alleged to be illegal, the judgment can be supported based wholly on the implied contract which made it the duty of the Central National Bank, under the facts disclosed, to account to the Cooper Exchange Bank for the money obtained from the latter in execution of the agreement made by the former with the borrower."

In the Earling Case the stock of a corporation engaged in the business of a creamery and making butter was turned over to the cashier of a national bank, but in trust for the bank, to whom the corporation was indebted. The business was carried on in the name of the original corporation, but for the benefit of the bank, and under its control. The corporation becoming insolvent, creditors of the creamery, while under management for the benefit of the bank, sued the receiver and the bank. The plea was that the national banking act prohibited it from doing other than a banking business, and for that reason there was no liability; but the court held that it was liable for these debts, saying:

"Although restitution of property obtained under a contract which was illegal cannot be adjudged by force of the illegal contract, yet, as the obligation to do justice rests upon all persons, natural and artificial, if defendant obtained the money or property of others without authority, the law, independent of express contract, will compel restitution or compensation."

In Pangborn v. Westlake, 36 Iowa, 546, 549, the rule is thus tersely stated:

"We are, therefore, brought to the true test, which is that while, as a general rule, a penalty implies a prohibition, yet the courts will always look to the language of the statute, the subject-matter, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and, if from all these it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the courts will so hold and construe the statute accordingly."

Was it the intention of the General Assembly of the state of Arkansas, as expressed in the statute, to impose upon a carrier delivering goods to the consignee without surrender or cancellation of the bill of lading, in addition to the large fine imposed by the statute if convicted in a criminal proceeding, and a civil liability for all damages sustained by the owner of the bill of lading, the further penalty of being prohibited from collecting the value of the goods thus illegally delivered? At common law a bill of lading, as stated in Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998:

"While a symbol of ownership designed to pass from hand to hand with or without indorsement, and is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated, because it has come into hands of persons who have innocently

paid value for it. The doctrine of bona fide purchasers only applies to it in a limited sense. It is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver."

To the same effect are The Lady Franklin, 8 Wall. 325, 19 L. Ed. 455; Shaw v. Railroad Co., 101 U. S. 557, 25 L. Ed. 892; Iron Mountain Railway Co. v. Knight, 122 U. S. 79, 7 Sup. Ct. 1132, 30 L. Ed. 1077; Friedlander v. Texas & Pacific R. R. Co., 130 U. S. 416, 9 Sup. Ct. 570, 32 L. Ed. 991; Missouri Pacific Ry. Co. v. McFadden, 154 U. S. 155, 14 Sup. Ct. 990, 38 L. Ed. 944.

The rapid growth of the commerce of the nation, shipments of products amounting in value to millions daily, necessitated a change of the common law. As appears from the foregoing cases, and numerous others to be found in the state as well as national reports, gross frauds were frequently practiced on vendees and banks by reason of bills of lading being issued by dishonest agents of the carriers when no goods had been delivered for shipment, and these bills were used for the fraudulent purpose of obtaining payment of the value of goods never shipped and for which there was no redress against the carrier, the only responsible party. To remedy that evil the Legislatures of most of the states, including this state, enacted statutes making them negotiable "in the same manner as bills of exchange and promissory notes," and, to prevent the fraudulent practice then prevailing, prohibited the issuance of bills of lading unless the goods were actually received by the carrier. To further protect the purchasers of these bills thus made negotiable, these statutes prohibit the delivery of the goods except upon surrender of the bill of lading. To prevent evasions of this statute, the act of this state prescribes certain penalties. Upon conviction in a criminal proceeding there is to be a fine not exceeding $5,000 and imprisonment in the penitentiary not exceeding five years, or both, and in addition thereto a liability in a civil action for all damages sustained by the owner of the bill of lading. It was no doubt supposed that these heavy penalties would deter carriers and their agents from violating the statute, and the liability of the carrier for the loss sustained by purchasers of the bills or warehouse receipts would protect them, and thus remedy the mischief then prevailing. To impose the additional liability on the carrier of depriving him of the right to maintain an action for the goods obtained without surrender of the bill of lading or the value if converted was evidently not deemed necessary, for it would award a premium to one of the wrongdoers and add to the severe punishment of the carrier provided by the statute. Courts should place no such construction on the act unless this intention is clearly expressed in the act. Bowditch v. N. E. Life Ins. Co., 141 Mass. 292, 296, 4 N. E. 798, 55 Am. Rep. 474; De Lucca v. North Little Rock (C. C.) 142 Fed. 597, 605; Nebraska Meal Mills v. Railway Co., 64 Ark. 169, 173, 41 S. W. 810, 811, 38 L. R. A. 358, 62 Am. St. Rep. 183, where the court said:

"To justify the court in arriving at such a conclusion, the language of the act to that effect should be so plain and direct that it would be unreasonable to give it a different meaning."

The rule would of course be different if the goods were delivered in pursuance of an illegal agreement or conspiracy between the carrier and the consignee for the purpose of defrauding the rightful owners. This would be a tort for which all parties aiding in its commission would be liable at common law even in the absence of any statute, and all parties engaged in it would be joint tort-feasors, or if it were sought to enforce specific performance of such an agreement.

That great inconvenience often resulted from a strict compliance with the provisions of section 530 of Kirby's Digest was recognized by the General Assembly of the state, and to prevent injuries arising therefrom it enacted the act of May 23, 1907. This is clearly shown by the preamble to that act, which is as follows:

"Whereas, section 530 of Kirby's Digest, Arkansas Statutes, provides that: No property stored or deposited for which receipts and bills of lading have been issued, shall be delivered up by the carrier, warehouseman, wharfinger or other person or firm except on surrender and cancellation of such receipts and bills of lading; and, whereas, It often happens that the shipper or consignee fails to receive said bill of lading or original receipt and the goods called for therein cannot be delivered on account of the absence of the original receipts and bills of lading, thus causing delay and injury to the goods. Therefore, be it enacted," etc.

Upon the facts in this case the court is of the opinion that the action of the referee in allowing the claim was right, and for this reason it is approved.