Arthur Lamb et al., Appellees, v. Fidelity & Deposit Company of Maryland, Appellant.

Gen. No. 8,365.

Opinion filed April 22, 1930.   Rehearing denied May 31, 1930.

McMILLEN, McMILLEN & GARMAN, for appellants.

McDAVID, MONROE & MANN, W. T. COLEMAN and HERRICK & HERRICK, for certain appellees. FRED BALL and GEORGE SMITH, for appellee Eliza B. Hughes.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

At the general election held in November, 1922, B. F. Coffman was elected county treasurer of Macon county and was required as a qualification for that office to execute an official bond as such treasurer in the sum of $400,000 and also a bond as county collector in the sum of $5,000,000. The Fidelity and Deposit Company of Maryland, appellant, executed these bonds as surety. The premium on the bonds to be paid appellant for its execution of the same as surety amounted to $6,000. Appellant as a further consideration for executing said bonds as such surety demanded that Coffman should procure from any bank in which he deposited funds as county treasurer or county collector an indemnifying bond conditioned that such bank should promptly pay to said Coffman, or his order, upon demand and presentation of proper and valid checks therefor, in the regular and ordinary course of business, all moneys which had been, or should thereafter be deposited with, delivered to, or placed in charge of said bank by or on behalf of said Coffman; and should keep and hold harmless said

Coffman as well as appellant of and from all loss or damages which might arise or accrue to said Coffman or appellant by reason of the deposit or delivery of said funds, or any part thereof as aforesaid, etc.

One of the banks in which Coffman as county treasurer and collector deposited moneys of the county was the Farmers State Bank and Trust Company of Decatur, Ill. This bank executed an indemnifying bond conditioned as above set forth together with ten personal sureties, among whom was Arthur Lamb, appellee. The Farmers State Bank and Trust Company failed on September 22, 1925, at which time Coffman had on deposit in the bank moneys of the county in the sum of $170,957.04. Appellant paid into the county treasury the amount of this deficiency and then instituted eight suits at law against the sureties severally on the indemnifying bond above mentioned. One of these suits was against Arthur Lamb, appellee, who filed numerous pleas therein. Before any of these suits at law came to trial Lamb filed a bill in chancery making appellant and eight of the sureties on the indemnifying bond and the executrices of the last wills and testaments of two of the sureties who had died, as parties defendant. The prayer of the bill is that the indemnifying bond be ordered surrendered up, canceled and held for naught and for a permanent injunction restraining the suits at law on the ground that the bond was a violation of the laws and constitution of the State of Illinois and against public policy. Appellant answered the bill and also filed a cross-bill praying for an accounting. On the hearing the chancellor entered a decree granting the relief prayed for in the original bill and dismissed the cross-bill for want of equity, from which decree appellant prosecutes this appeal.

In the original bill it is alleged in substance that after the election, Coffman requested the board of

supervisors of Macon county to designate the bank or banks into which he should deposit the public moneys and to pay out of the interest from such deposits the premium on his official bond; that the board refused to do this but approved the bond of Coffman with proviso that the county did not assume any part of the premium thereof; that prior to November 22, 1922, Coffman after failing to secure the consent of the board of supervisors to the prayer above set forth and before entering on the duties of his office entered into a secret agreement whereby he, in consideration of appellant acting as surety on his official bonds and enabling him to qualify for office, agreed to permit it to choose and name the banks into which the public funds of his office should be deposited; that the premium of $6,000 charged by appellant for becoming surety on the bonds should be paid to it from moneys collected by it from the various banks into which it should cause the public funds to be deposited; that the agreement was further to the effect that appellant after becoming surety on the official bonds should make such arrangement as it cared to make with the banks in which it would direct the funds to be deposited; that instead of the depositories paying the money to Coffman, appellant was to collect from the banks the amount of its premium; that after Coffman had qualified and received all the public funds of his office from his predecessor, appellant under its agreement and arrangement with him, entered into negotiations with the Farmers State Bank and Trust Company of Decatur, and represented to the said bank that it had secured from said Coffman the right to select where the public funds of his office should be deposited and that it had arranged to become surety on Coffman's bonds and to charge $6,000 as premium therefor and that the premium was to be paid by the banks in which it permitted and directed the public

funds to be deposited, and that the sum so paid to it by the depository banks was to be used in payment of the premium charged on the official bonds of Coffman, and was to be an interest bonus or paid by the depository banks for the benefits received by them from the deposits of said funds; that as a further consideration for the deposit of said funds, it would require said bank to furnish an indemnity bond guaranteeing the prompt repayment to Coffman or his order in the regular and ordinary course of business, all moneys deposited by him with the said bank, said bond to keep and hold harmless Coffman as well as appellant from any loss or damage by reason of the deposit in the said bank of any funds by said Coffman; that after such representations had been made to said bank it attempted to execute said bond of indemnity by causing it to be executed in its name by its president and cashier, but that the attempted execution of said bond was ultra vires and void; that the sureties who signed said bond did so at the request of said bank and did not know of the arrangement between Coffman and appellant.

The bill further charges that the bond of Coffman as county treasurer was void for reason that the consideration was illegal; that the contract was against public policy of the State which prohibits a public officer from trafficking or bargaining on matters touching the affairs of his office, and that by reason of the invalidity of the county treasurer's bond, the indemnifying bond executed by the bank was also void. It is further charged that said bank received savings deposits and that section 4 of the provision of the Criminal Code as to banks, Cahill's St. ch. 38, ¶ 41, prohibits savings banks from assuming or becoming liable for or guaranteeing bonds, notes or other evidences of indebtedness for the account of any persons, firm or corporation and that the execution of said

indemnifying bond was in violation of said statute and did impair the deposits and trust funds of said bank; that the arrangement between Coffman and appellant in regard to the method of paying the premium on the bond violated section 81 of the provisions of the Criminal Code as to embezzlement, Cahill's St. ch. 38, ¶ 193, which provides that if any public official shall use public funds by way of investment of loan for his own use he will be subject to fine and imprisonment; that Coffman by agreeing with the surety to permit the latter to select the depositories of the county's moneys violated said statute and that the indemnifying bond having been a part of the original transaction was therefore also void; that said transaction also violated section 3 of the "Corrupt Practices Act," Cahill's St. ch. 102, ¶ 3; that it also violated section 10, article 10 of the constitution which prohibited the acceptance by Coffman of any fee or allowance under and above his compensation as fixed by law.

It is further charged in the bill that these defenses could not be made in a suit at law and that eight separate suits are pending which will cause a multiplicity of trials and that the question raised in each is identical; that if appellant succeeds in one or more of the suits at law, suits for contribution will be necessary and that the same defendants as are in said suits at law are involved and that an accounting will be necessary, all of which matters could be fully tried and determined in one suit.

The contention of the complainant in the bill is that the alleged agreements made between Coffman, appellant, and the Farmers State Bank and Trust Company in regard to the execution of the bond of Coffman as county treasurer rendered it void and that the execution of the indemnifying bond of said bank was so connected with the execution of the county treasurer's bond that it became part of the same transac-

tion and was therefore also void. To sustain this contention counsel for appellee state in their brief: "It is urged by complainant that, had not the Farmers State Bank and Trust Company agreed to, and actually did, execute and deliver said indemnifying bond, and also pay the $3,000 demanded of it, the surety company would not have executed the official bond of the treasurer. This, we believe, will be admitted. Therefore, the giving of the indemnifying bond is actually a part, and a very important part, of the original undertaking." The facts do not sustain this contention. The bond of Coffman as county treasurer was executed November 22, 1922, and was approved by the board of supervisors on December 14, 1922, while the indemnifying bond was not executed until December 20, 1922, nearly a month after the execution of the treasurer's bond. Complainant's case is based upon two transactions in regard to the execution of the bond of Coffman as county treasurer. One involved an alleged agreement made between appellant, Coffman and the Farmers State Bank and Trust Company of Decatur and the other a substantially same agreement made by appellant, Coffman and the Lincoln National Bank of Lincoln. Each of these banks gave an indemnifying bond and each of them paid one-half of the premium on the treasurer's bond. Both transactions with these banks took place in the latter part of December, 1922, and subsequent to the execution of the county treasurer's bond and its approval by the board of supervisors. The indemnifying bond of the Farmers State Bank and Trust Company involved in this case bears the corporate seal of said bank and is executed by J. R. Pogue, president, and F. E. Harrold, cashier, also by the personal sureties of Pogue, Harrold, White, Kaiser, Lamb (appellee), Hughes, Barber, Flint, Paisley and Harvell, each signature being under seal.

The evidence of the alleged agreement with the Farmers State Bank and Trust Company rests solely upon the testimony of Pogue, president of said bank. Appellant's agent who acted for it in the procurement of the bond for Coffman was William E. Hodnett. Pogue testified that he never had had any other business transactions with Hodnett before the one in question and did not know him until a week or two before the indemnifying bond was executed. He relates the transaction in substance as follows: "The conversation was on the morning of December 21, 1922 in the bank. Hodnett and Coffman came in together and we discussed Coffman's bond. Hodnett seemed to be trying to figure out some way the bond could be secured. This conversation occurred in the private office of the bank. Coffman was there part of the time and Hodnett and I were there during all of the conversations. Hodnett said he was trying to fix a bond for Coffman and that he might finance part of it with the banks in Lincoln and that the Farmers State Bank and Trust Company would be the chief depository here and asked me under these conditions how much of a premium my bank would pay. I told him we could pay $3,000 of it. Coffman came back later and we discussed how much of a deposit should go to the other banks. The Farmers State Bank and Trust Company was to be the chief depository but it was necessary to give the other banks some of the deposit." This testimony is wholly inconsistent with the actual facts as the bond of Coffman as county treasurer had already been executed by him and also by appellant as surety and had been approved by the board of supervisors as heretofore shown. Upon being asked what the witness did immediately following this conversation between himself and Hodnett he testified: "I issued to Mr. Hodnett a draft for $3,000. . . . I took William E. Hodnett's note for $3,000 dated December 20, 1922.

This note seems to have been dated the day before the transaction in regard to the draft I have testified about. I had no other transaction with William E. Hodnett in December, 1922 other than the note for which I gave him a draft. . . . I think he made the remark that the public funds would make me that much interest by the time that note was due or about so. The $3,000 note was paid from the interest fund of the bank. Prior to the conversation with Hodnett, Coffman had deposited county treasury funds in my bank. The account was opened on December 15 with a deposit of $67,276.19. . . . At the close of business on December 19, 1922, the balance of the account of Coffman as county treasurer in the bank was $88,-298.75. I made no reply to Hodnett's statement that some of the banks were going to contribute to the expense of Coffman's bond when he first made the remark. Later in the same conversation I did say the bank would be willing to pay $3,000 toward that expense. The interest account was the record the bank kept of the collections of interest on notes and other papers belonging to the bank. We had receipts from the rental of the safety deposit boxes and we had interest receipts from bonds and also from exchange and we had miscellaneous accounts, different items. Every six months there would be a balance struck in these different accounts and the balance credited up to undivided profits. The interest accounts represented simply the interest that was received by the bank on the notes representing money loaned by the bank. The only items that were charged to the account were items representing interest actually earned and collected on the notes of borrowers from the bank. All interest collected on notes was credited to the interest account and charged against the interest account was the interest on money borrowed by the bank. I do not remember just when the credit was made from the

interest account to the $3,000 note. The amount of it was deducted from the interest earnings of the bank on its notes receivable. I first saw or heard of the indemnity bond the latter part of December, 1922. Probably a week before it was executed. I kept it for four or five days or a week securing signatures of the sureties, and then delivered it to Coffman. All the sureties signed in my presence. The interest collected on county moneys was credited to the interest fund and then transferred to the payment of the note. When Hodnett first came to see me he made the statement that he was arranging for the bond of Coffman and stated he had made arrangements with some of the banks for the payment of part of the premium. *He did not say he had the right to signify the depositories of the funds deposited by Coffman. I assumed that only from the conversation.* The only transaction I had with Hodnett was in reference to the bond. I let him have the money to pay the premium. He gave his note as security. I investigated and found he was responsible. *There was nothing said about crediting interest on the county money.* The only credit that was made was when the note was paid. The only way there was any interest earned on this county money was by the loan of it to our borrowers and the only items credited to the interest account were items representing interest collected on notes for money loaned. I didn't make any distinction of where the loans came from. County deposits were mingled with other deposits of the bank and out of the total deposits the bank loans were made and interest collected. There was no distinction between loans made from the deposit of the county funds and loans made from the deposit of any other customer. There was no separation by anyone in the bank as to the source of the loans.''

The contention of appellee that the bond given by Coffman as county treasurer was void is wholly without merit. The bond was given for the benefit of the county which was not a party to any of these transactions. It was a valid and binding obligation between the county, Coffman and appellant. It could not be voided by any agreement which might have been made by the principal and his surety with third parties no matter how fraudulent such agreement might have been. As between the county and the obligors on the bond it was a perfectly valid obligation.

The testimony of Pogue does not disclose that the execution of the indemnifying bond was made a part of the consideration for the agreement between Hodnett, agent for appellant, and the bank. Coffman as county treasurer deposited the county funds in a number of different banks and required an identical indemnifying bond from each bank in which he made such deposits. The execution of the indemnifying bond involved in this case was after the execution of Coffman's bond as county treasurer and after said bond had been approved by the board of supervisors. Coffman never received any interest from the bank personally. The interest received by the loaning of the funds of the county was mingled with the interest received from all other loans and all other receipts and profits of the bank and the $3,000 was paid by the bank from the general profits of the bank.

A county treasurer in counties having a population of less than 150,000 inhabitants may deposit moneys of the county in any bank and may or may not make an agreement with such depository bank that the latter shall pay interest on such funds so deposited with it. If he does make such an agreement, then the interest earned from such deposits pursuant thereto becomes the property of the county. If the evidence can be

construed to show that Coffman indirectly received the benefit of the $3,000 as interest from the deposit of the county funds in the bank, then he would be liable to the county for that amount, and the county could sue upon the treasurer's bond to recover the same. A fair construction of the testimony of Pogue leads to the conclusion that the bank was willing to pay to appellant $3,000 out of the general profits of the bank or its assets on the premium of the bond of Coffman for the privilege of becoming a depository of the county funds. Alleged fraud must be clearly proven. Pogue testified, "He (Hodnett) did not say he had the right to signify the depositories of the funds deposited by Coffman. I assumed that only from the conversation," and also, "I let him have the money to pay the premium. He gave his note as security. I investigated and found he was responsible. There was nothing said about crediting interest on the county money." In our opinion the proofs do not disclose a fraudulent collusion between appellant, Coffman and the bank to defraud the county of interest earned on the county funds.

The evidence in regard to the transaction with the Lincoln National Bank of Lincoln is substantially the same except that in that case the note was executed by Coffman instead of Hodnett but the money was paid to Hodnett for the benefit of appellant. All the testimony in regard to the alleged agreement made between appellant and the Lincoln National Bank was incompetent for two reasons, (1) none of the transactions between appellant, Coffman and the Lincoln National Bank are set out in the bill; (2) it can be of no concern whatever to the appellees what arrangement was made between appellant and the Lincoln National Bank no matter how fraudulent the agreement with that bank might have been as it could not in any way have affected the interests of appellees.

Surety companies organized for the purpose of becoming sureties on official and commercial bonds have an established place in furnishing security for commercial and legal requirements and have become practically indispensable where large amounts of money are involved. They are regulated by law and operate under qualifications and restrictions provided by the legislature. The law implies a promise on the part of a bank to repay funds deposited with it and it is not unlawful for the bank to give security that it will perform this duty. In the case of *Comstock v. Gage,* 91 Ill. 328, Gage was the city treasurer of Chicago and deposited the city funds in the Manufacturers' National Bank of Chicago. The bank gave an indemnifying bond to Gage as such treasurer conditioned that it should promptly upon demand or presentation pay all checks or drafts which may be made by said Gage as treasurer, etc. This bond was executed by the bank and by a number of personal sureties. Suit was brought upon the bond by Gage for the use of the city, in which the sureties pleaded that by an arrangement between the bank and Gage the moneys deposited were to remain as security for Gage's private indebtedness to the bank so that his power to withdraw the money depended upon his ability to pay such indebtedness and the fact of such arrangement not having been communicated to the sureties they were not bound. The court held: "There may have been irregular and censurable conduct of Gage in mixing up public with private business, but we cannot think it should have the effect of vitiating this bond. Its condition requires nothing illegal, but guarantees that the bank shall simply perform its duty, which, in law, it was, in any event, bound to perform, viz., to pay over the city money thus being on deposit, to the city treasurer when demanded. It was not part of any scheme to violate the law, or to misappropriate the public

moneys, but a guaranty that the money should be paid over to the party to whom it rightfully belonged.

. . . This was just what the bank ought to do. There would arise an implied promise on its part to do it; and why might not an express engagement by another person, that the bank should perform this, its implied promise, be valid?" In *McFerson v. National Surety Co.*, 72 Colo. 482, it is said: "The right of the treasurer to deposit money in the banks is not involved, and that right is of course undoubted. There is no question that a bank, in order to secure deposits, may give security for them. The giving of the indemnifying bonds was within the authority of the banks, and was a matter of ordinary business." In the case of *Interstate National Bank v. Ferguson*, 48 Kan. 732, the court held: "And a bank may certainly, as a part of its legitimate banking business, receive deposits, pay interest thereon, secure its depositors by bond or any other lawful means, and loan the money which it receives as general deposits"; in *Leonard Co-op. Creamery Ass'n v. First State Bank*, 168 Minn. 28, in discussing the power of a bank to give an indemnifying bond to its depositor held: "We see no reason why this kind of transaction is not an incidental power. Inherently it is not detrimental to either the stockholders, depositors or to the public. It may be beneficial to all. In case of insolvency the transaction has not increased the liability to the detriment of others. . . . Banks may by giving such a bond be able to procure deposits which otherwise they would never have. The incidental power necessarily implies that a bank may give such a bond. It does not increase the bank's liability beyond that which would result if the deposit was received without the bond. Whether the bank should in fact furnish it and pay the premium usually incident to a surety bond rest in the

judgment of the management. The incidental expense is trivial. The incidental possibilities may be as important and valuable as they may be attractive." It is not unlawful for a surety to require the principal on the bond to designate where the funds secured by the bond shall be deposited. In the case of *McCollister v. Bishop*, 78 Minn. 228, the court said: "It is customary, as well as entirely proper, for these fidelity companies, before executing bonds as surety, to insist on being advised, and having some understanding with their proposed principal, as to where the trust funds will be deposited. This is a matter which affects the risk which they will assume if they execute a bond. It also enables them to keep track of the conduct of their principal with regard to the disposition of the fund."

Although an obligation may be directly connected with an illegal transaction, it will not thereby be barred from enforcement if it is not necessary to require the aid of the illegal transaction to make out a case. *Teich v. Chicago*, 298 Ill. 498; *Pitsch v. Continental & Commercial Nat. Bank*, 305 Ill. 265. In the case of *Illinois Surety Co. v. Munro*, 209 Ill. App. 407, the court held: "Contracts of indemnity are distinguished from those of guaranty in that in indemnity contracts the engagement is to make good and save another from loss upon some obligation which he has incurred or is about to incur to a third person, and is not, as in guaranty, a promise to one to whom another is answerable. The promise in an indemnity contract is an original and not a collateral undertaking. 22 Cyc. 79-80." This bond of indemnity is an original and not a collateral contract and for its enforcement requires no aid of any other transaction legal or illegal.

By leave of court counsel for appellee, Eliza Hughes, administratrix of the last will and testament of George Hughes, deceased, have filed a brief in be-

half of said appellee wherein is discussed the liability of the estate of the deceased but under the present condition of the record this question cannot be considered at this time on this appeal, as it must first be determined and adjudicated in the court below.

For the reasons set out in this opinion the decree of the circuit court is reversed and the cause remanded with directions to grant the relief prayed for in the cross-bill of appellant and to dismiss the original bill for want of equity.

*Reversed and remanded with directions.*

SHURTLEFF, J., took no part in this case.