Central Republic Trust Company, for use of Reconstruction Finance Corporation, Appellant, v. Peter L. Evans et al., Appellees.

Gen. No. 39,121.

Opinion filed December 30, 1940. Rehearing denied January 16, 1941.

FRANK MICHELS, LEE WALKER and R. A. BULLINGER, all of Chicago, and GEORGE C. ELLSWORTH and HARVEY J. GUNDERSON, both of Washington, D. C., for appellant; JAMES B. ALLEY and MAX O'RELL TRUITT, both of Washington, D. C., of counsel.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for certain appellees; JAY FRED REEVE, of Chicago, and JOSEPH B. FLEMING, of counsel.

LITSINGER, HEALY, REID & BYE, of Chicago, for certain other appellee; ELBRIDGE W. RICE, of Chicago, of counsel.

EUGENE E. DORNBAUGH, of Chicago, for certain other appellee; JOHN M. O'CONNOR, JR., of Chicago, and EUGENE E. DORNBAUGH of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

This is an action at law on a demand promissory note for $210,000 dated August 12, 1930. Defendants, Peter L. Evans, Harold C. Strotz, John A. O'Keefe, Fred W. Georgs, Robert A. Schiewe, Byron C. Thorpe, Nelson K. Reese, John T. Cunningham, Henry A. Sellen and Henry D. Cheney, together with Otto C. Braese, since deceased, were the makers of the note. The payee was The National Bank of The Republic of Chicago. The note was assigned by the latter to Chicago Trust Company, a banking corporation of Illinois, and assigned by that company to Central

Republic Bank and Trust Company, a banking corporation, the name of which was later changed to Central Republic Trust Company. The latter company pledged the note with Reconstruction Finance Corporation, a corporation organized and existing under the laws of the United States. The original plaintiff was Central Republic Trust Company, but subsequently Reconstruction Finance Corporation was substituted as beneficial plaintiff. Plaintiff filed a declaration in one count, supported by an affidavit of merits. On February 7, 1933, judgment by confession for $245,811.25 was entered. On February 16, 1933, defendants' motion to open the judgment and permit them to defend on the merits, the judgment to stand as security, was allowed. After certain pleas were filed by defendants, there was a trial before the court and a jury, and at the conclusion of the evidence a verdict for defendants was directed. Plaintiff appeals from the judgment entered upon the verdict.

Defendants filed four pleas to the declaration: I. That they did not promise. II. That they did not make and deliver the writing mentioned in the declaration. III. That the note mentioned in the declaration was not made, executed and delivered with the purpose that the same should have effect as the binding obligation or the valid and obligatory promissory note of them, or either of them, in this: That on August 11, 1930, defendants, and each of them, were stockholders and directors of Madison Square State Bank; that George Woodruff, then chairman of the board of directors of The National Bank of The Republic and National Republic Bancorporation, desired, on their behalf, to acquire control of Madison Square State Bank by the purchase from the stockholders thereof of a majority of the capital stock of the bank by National Republic Bancorporation, and Woodruff, acting as agent of The National Bank of The Republic and National Republic Bancorporation, stated to de-

fendants that if they would agree to cause the capital stock of Madison Square State Bank of $300,000, consisting of 3,000 shares, to be reduced to a new capital of $200,000, represented by 2,000 shares, the surplus of $100,000 to be reduced to $50,000, and the then undivided profits and reserve of approximately $59,520 to be reduced to $9,520, National Republic Bancorporation, upon delivery to it of 1,001 shares of the capital stock of Madison Square State Bank out of the reduced capitalization of 2,000 shares, would agree to deliver to the transferors of said 1,001 shares, 6,006 shares of the capital stock of said National Republic Bancorporation in the ratio of six shares of said stock for each share of Madison Square State Bank stock; that Woodruff further stated that Madison Square State Bank should be placed in a more liquid condition and to accomplish that purpose the capital stock of Madison Square Safe Deposit Company, which owned the bank building and premises occupied by Madison Square State Bank, should be removed from the assets of said bank, and $210,000 in cash be substituted therefor, by a transaction having the form of a sale of the Safe Deposit Company stock by the bank to the defendants, but that they should not be the real owners of said stock; and further stated that The National Bank of The Republic would supply the $210,000 and that defendants should lodge a note with that bank of $210,000 as a matter of form; that defendants would not be liable for the payment thereof; and that he, Woodruff, and The National Bank of The Republic and National Republic Bancorporation would at a future time cause Madison Square State Bank to repurchase the capital stock of the Safe Deposit Company; that the note would be paid out of the proceeds of such repurchase; that The National Bank of The Republic would look only to the proceeds of such repurchase for the payment of the note and would hold the note until said repurchase, when it would be delivered back to defend-

ants; that the note would not at any time be the legal and binding obligation of defendants; that inasmuch as he, Woodruff, The National Bank of The Republic and National Republic Bancorporation and defendants would all be partners in Madison Square State Bank, they should repose confidence in his statement, and that defendants, reposing confidence in and relying upon the statements and assurance so made by Woodruff, acting as agent, entered into an agreement to change the capital structure of Madison Square State Bank, as above described; that the note was not delivered to the payee for the purpose of giving effect at any time to it as a valid unconditional promissory note; that at the time the note was indorsed, ordered and appointed by said payee to the Chicago Trust Company, as alleged in the declaration, said Chicago Trust Company well knew that the same had been made and executed under the circumstances stated and that the Chicago Trust Company, so knowing, did not become by such indorsement, order and appointment, and was not at any time a holder in due course of said note; that at the time Chicago Trust Company delivered the note to plaintiff, as alleged in the declaration, plaintiff well knew that the same had been made and executed under the circumstances hereinbefore stated, and that plaintiff was not and is not a holder in due course of the note. IV. That there was no consideration for the note, in this, that it was made and executed for the accommodation of the payee therein named, and defendants did not receive at the time of the execution of the note $210,000 or any part thereof, or any other thing of value, and were not at said time indebted to The National Bank of The Republic; that at the time when the note was indorsed, ordered and appointed by The National Bank of The Republic to the Chicago Trust Company, as alleged in the declaration, said Chicago Trust Company well knew that the same had been made

and executed under the circumstances hereinbefore stated, and that Chicago Trust Company, so knowing, did not become by such indorsement, etc., and was not at any time a holder in due course of the note; that at the time the Chicago Trust Company delivered the note to plaintiff, as alleged in the declaration, plaintiff well knew the circumstances under which the same had been made and executed, and plaintiff was not and is not a holder in due course of the note.

Subsequently, John T. Cunningham, defendant, filed an additional plea (V), which, in substance, alleges:

1. That The National Bank of The Republic procured the note from defendants in pursuance and furtherance of an unlawful conspiracy and confederation originated and carried out by The National Bank of The Republic, contrary to and in violation of the public policy and statutes of the United States and State of Illinois.

2. That from 1929 to 1933, and for a long time prior thereto, The National Bank of The Republic was a national bank, subject to all the provisions of the National Banking Act.

3. That Chicago Trust Company was a bank organized under the statutes of the State of Illinois and a wholly-owned subsidary and a branch and agency of The National Bank of The Republic.

4. That from 1929 to 1932 George Woodruff was chairman of the board of The National Bank of The Republic and vice chairman of the board of Chicago Trust Company; that John A. Lynch was chairman of the executive committee of The National Bank of The Republic as well as Chicago Trust Company; that John W. O'Leary was president and a director of The National Bank of The Republic and Chicago Trust Company; David R. Forgan was vice chairman of the executive committee of The National Bank of The Republic and of Chicago Trust Company; Charles S. Castle was vice chairman of the executive committee

of The National Bank of The Republic and Chicago Trust Company; Ward C. Castle was vice chairman of the executive committee of The National Bank of The Republic and Chicago Trust Company; H. E. Otte was vice chairman of The National Bank of The Republic and the Chicago Trust Company; Lucius Teter was vice chairman of The National Bank of The Republic and chairman of the board of Chicago Trust Company; and that said persons were in active charge and management of the affairs and policies of The National Bank of The Republic and Chicago Trust Company and dominated the board of directors of said banks.

5. That in August, 1929, The National Bank of The Republic caused to be formed, as an affiliated organization of The National Bank of The Republic, an investment trust known as National Republic Investment Trust; that the investment trust was formed pursuant to the terms of a Declaration of Trust which was executed August 1, 1929, by John A. Lynch, David R. Forgan, George Woodruff, Charles S. Castle, H. E. Otte, Lucius Teter, John W. O'Leary and Ward C. Castle. (Copy of the trust is here inserted in the plea.) That it designated that the entire beneficial interest of the trust be vested in shareholders who shall from time to time be holders of the shares issued thereunder.

6. That the trustees were the same persons that were officers of The National Bank of The Republic and Chicago Trust Company.

7. That in 1929, The National Bank of The Republic, its officers and directors, devised and planned to carry out an illegal plan and scheme whereby the said bank, through its agents and affiliates, would establish and maintain more than one banking house and would maintain branch banks, branch offices, and additional offices and agencies for the purpose of conducting the business of the said bank; that thereupon, in 1929, the said bank and its officers and directors and agents entered into an unlawful conspiracy and con-

federation with each other to evade and violate the statutes of the United States pertaining to Banks and Banking and also the statutes of the State of Illinois, in particular sec. 9, ch. 16a, Cahill's Ill. Rev. Stats. 1929, as amended, being the General Banking Act; and also sec. 2, ch. 32, Cahill's Ill. Rev. Stats. 1929, being the General Corporation Act.

8. That all of the acts of The National Bank of The Republic, National Republic Investment Trust, and National Republic Bancorporation and their officers, directors and trustees, which are hereinafter referred to, were done and performed in pursuance and consummation of an unlawful conspiracy and confederation, and were done for and on behalf of The National Bank of The Republic and at its solicitation and request, and that the formation of said Investment Trust was in pursuance of said conspiracy.

9. That in pursuance of said conspiracy George Woodruff, John A. Lynch, John W. O'Leary, H. E. Otte and Ward C. Castle, acting on behalf of The National Bank of The Republic, in 1929, agreed to form a holding company under the General Corporation Act of Illinois, to acquire various national and state banks located in the State of Illinois, said corporation to be known as National Republic Bancorporation (hereafter called Bancorporation), and procured agreements from the stockholders of various national and state banks located in the State of Illinois whereby Bancorporation might acquire said stock of the aforesaid banks in exchange for stock of Bancorporation after the same had been organized.

10. That on January 6, 1930, Woodruff, Lynch, O'Leary, Otte and Ward C. Castle agreed to file with the secretary of state of the State of Illinois a statement of incorporation, applying for a certificate of incorporation creating National Republic Bancorporation, under the General Corporation Act of the State of Illinois, with authorized capital stock of $20,000,000.

11. That on January 6, 1930, said persons were

elected directors of Bancorporation, to hold office until the first stockholders' meeting.

12. That on January 10, 1930, a certificate of incorporation was issued by said secretary of state to Bancorporation, and filed for record in the office of the recorder of Cook county, Illinois, January 11, 1930.

13. This paragraph incorporates a copy of the certificate of incorporation of National Republic Bancorporation and of the statement of incorporation, which latter states ''the object for which it is formed is: To purchase, or otherwise acquire, hold, sell, deal in, mortgage, pledge or otherwise dispose of all forms of securities, including stocks, bonds, debentures, notes,'' etc.

14. That on January 14, 1930, Woodruff, Lynch and O'Leary, acting as directors of Bancorporation, adopted certain by-laws, Article 10 of which provided for a Management Committee consisting of officers of the corporation and one representative of each of the banks affiliated with the corporation, these representatives to be appointed by the board of directors of Bancorporation; that said Article 10 was rescinded December 11, 1931; that pursuant to said by-law a management committee was appointed by the aforesaid directors, and said management committee held regular meetings during 1930 and 1931, at which they exercised the powers conferred upon them by the aforesaid by-law.

15. That on January 14, 1930, the following were elected officers of Bancorporation: George Woodruff, chairman of the board; Gustave F. Fischer, president; L. C. Laycock, vice president; Ward C. Castle, secretary, and J. W. Jedlan, treasurer.

16. That on January 20, 1930, directors of Bancorporation authorized exchange of stock of Bancorporation for stock of various banks in ratio, to-wit:

''Cosmopolitan State Bank . . . 13½ shares of National Bancorporation stock for one share of Cosmopolitan State Bank stock.

"Peoples National Bank . . . 3½ shares of National Republic Bancorporation stock for one share of Peoples National Bank stock.

"Western State Bank . . . 15 shares of National Republic Bancorporation stock for one share of Western State Bank stock.

"Austin State Bank . . . 11 shares of National Republic Bancorporation stock for one share of Austin State Bank stock.

"First Englewood State Bank . . . 11½ shares of National Republic Bancorporation stock for one snare of First Englewood State Bank stock.

"Adams State Bank . . . 9½ shares of National Republic Bancorporation stock for one share of Adams State Bank stock.

"National Bank of Republic of Chicago . . . 8½ shares of National Republic Bancorporation stock for one share of National Bank of Republic stock."

17. That on January 20, 1930, the Organization Committee of Bancorporation presented certain written agreements made and entered into in 1929 by the said Organization Committee acting on behalf of the proposed Bancorporation, The National Bank of The Republic, and National Republic Investment Trust, which agreements provided for the exchange of stock of Bancorporation for stock owned by certain stockholders of the aforesaid banks, and by resolution unanimously adopted, the agreements were ratified.

18. That Cosmopolitan State Bank, Western State Bank, Austin State Bank, First Englewood State Bank and Adams State Bank were banks organized under the statutes of Illinois, and Peoples National Bank and Trust Company was a national bank located in the State of Illinois and formed under the United States statutes pertaining to Banks and Banking.

19. That on July 11, 1930, Bancorporation acquired by exchange of its stock fifty per cent of the outstanding stock of United American Trust and Savings

Bank, a new bank organized and incorporated under the laws of the State of Illinois.

20. That in August, 1930, Bancorporation and The National Bank of The Republic entered into negotiations with defendants, as a result of which, on August 11, 1930, a certain written agreement was prepared by the agents and attorneys for and at the instance and request of The National Bank of The Republic and Bancorporation, which agreement was thereupon executed by the parties thereto, Bancorporation and defendants, and is as follows:

"This Agreement, made August 11, 1930 between National Republic Bancorporation, a corporation organized under the laws of the State of Illinois, (hereinafter sometimes for convenience designated 'Bancorporation'), and the undersigned, being all of the directors of Madison Square State Bank, a corporation organized under the banking laws of the State of Illinois, said directors being also stockholders of said bank, holding the number of shares of stock indicated opposite their respective signatures, (hereinafter for convenience sometimes designated 'Directors' and which said bank is sometimes hereinafter for convenience designated as 'Bank'), Witnesseth:

"Whereas the directors and the stockholders of said Bank desire to secure for said Bank the benefits of affiliation with the Bancorporation, and Bancorporation desires to secure a substantial ownership of stock in said Bank under the terms and conditions hereinafter set forth.

"Now Therefore, in consideration of the mutual covenants and undertakings of the parties, it is agreed by the parties hereto as follows:

"(1) Upon the delivery to Bancorporation of 1,001 shares of the capital stock of said Bank out of a reduced authorized capitalization of 2,000 shares as more fully hereinafter set forth, and the performance of the agreements of said Directors hereinafter made, Ban-

corporation agrees to deliver to the transferrors of said 1,001 shares of Bank stock, 6,006 shares of the capital stock of Bancorporation in the ratio of six shares of said stock for each share of said Bank stock.

"(2)   The Directors jointly and severally agree to do or accomplish, or cause to be done or accomplished, the following things:

"(a)   To reduce the capital, surplus and undivided profits and reserve of said Bank by proper action of the Board of Directors and stockholders of said Bank, and with the approval thereof by the proper state banking authorities as follows:

"The present capital of $300,000 consisting of 3,000 shares to be reduced to a new capital amount of $200,-000 represented by 2,000 shares; the present surplus of $100,000 to be reduced to a new surplus amount of $50,000; the present undivided profits and reserve of approximately $59,520 to be reduced by an even $50,-000 to a new undivided profit and reserve of approximately $9,520.

"(b)   To set aside assets representing the $100,000 reduction in capital, $50,000 reduction in surplus and $50,000 reduction in undivided profits and reserve, a total of $200,000 and assign, transfer and set over same unto John T. Cunningham, Nelson K. Reese, and R. A. Schiewe, as Trustees, (hereinafter for convenience sometimes referred to as 'Stockholders' Trust'), to cover losses, if any, sustained in the liquidation of the assets retained by the Bank, and/or by reason of undisclosed or increased liabilities, contingent or otherwise, to the extent of the realized proceeds of said trusteed assets, in accordance with the terms of a trust agreement embodying substantially the provisions hereinafter in paragraph (3) set forth.

"(c)   To cause said Trustees to issue certificates divided into 1,000 shares representing the beneficial interest, if any, in said trust fund after the application thereof to the purposes of the trust.

"(d)  To exchange with the stockholders of said Bank shares of stock of the Bank so reduced, and certificates of beneficial interest, for all of the existing shares of stock of said Bank on the following basis: Two shares of the new capital stock under the reduced capitalization, and One share of trust beneficial interest for each Three shares of the present existing Bank stock.

"(e)  To transfer and deliver, or cause to be so transferred and delivered, by each stockholder one-half of the Bank stock newly issued as above provided, making a total of 1,000 shares of said Bank stock, together with one additional share of said Bank stock to make a total of 1,001 shares thereof, to Bancorporation in exchange for shares of said Bancorporation in the ratio of six shares of Bancorporation stock for each share of Bank stock so delivered. Stock transfer stamps required shall be paid for by the respective transferrors of stock.

"(f)  To purchase from the Bank the entire capital stock of Madison Square Safe Deposit Company, a corporation which owns the bank building and premises, together with all furniture, fixtures and vault equipment located therein for the sum of $210,-000 cash, immediately upon the adoption, ratification and approval of this agreement by the Board of Directors and stockholders of said Bank and the State Bank authorities.

"(g)  To transfer said entire capital stock of Madison Square Safe Deposit Company to Chicago Trust Company, Trustee, in trust, to cover any losses sustained by the Bank upon retained assets, or by reason of undisclosed or increased liabilities, contingent or otherwise, in excess of the losses covered by and/or satisfied out of the assets of the said Stockholders' Trust; the terms of which trust (hereinafter for convenience sometimes referred to as the 'Directors Trust') shall be set forth in a trust agreement between

618

said Directors and said Trustee, embodying substantially the provisions hereinafter in paragraph (5) set forth.

"(h)   To cause said Madison Square Safe Deposit Company to execute and deliver to said Bank a lease of the Bank building and premises now occupied by said Bank and Safe Deposit Company, together with all its furniture, fixtures and vault equipment located therein (said vault to be operated by the Bank) for a period of five years from the date of the consummation of this agreement, at an annual rental of $15,000 payable monthly in advance in equal installments; which rental shall be increased for any half year rental period during the term of said lease at the rate of $1,500 per year for each increase of $500,000 in average deposits in said Bank during such half year rental period over and above deposits of $2,500,000; excluding, however, from any such increase any and all deposits of public money; the execution and delivery of said lease to be approved and ratified concurrently with the adoption, approval and ratification of this agreement by at least two thirds vote of the stockholders of said lessor.   The lessor shall assume and agree to pay promptly when due all taxes, insurance premiums and all interest on mortgage encumbrances on said property and/or interest on any other moneys borrowed by it; all other expenses and operating costs shall be paid by the lessee.   Said lease shall contain an option in favor of the Bank, its successors and assigns, to purchase said building and premises, together with the furniture and fixtures and vault equipment at any time during the term of the lease at a price of $210,000 plus the assumption of a total mortgage indebtedness and/or any other indebtedness of said lessor outstanding and unpaid, not to exceed $143,000 of said Madison Square Safe Deposit Company.

"(3)   The trust agreement creating the trust referred to as Stockholders' Trust in sub-paragraph (b)

in paragraph (2) hereinabove, shall contain substantially the following provisions: The Trustees shall liquidate all of said trusteed assets from time to time and convert same into cash and for such purpose shall have all the rights and powers necessary therefor or incidental thereto. No settlement involving more than $2,000 shall be made without consent of said Bank. Said Bank shall be privileged to transfer or substitute securities and/or assets of those which shall be retained by said Bank, for assets, securities and/or cash in the hands of the Trustees at any time during the period of said trust. The Trustees shall be obligated upon demand of the Bank to pay out of said Trust funds to it the amount of any losses sustained by the Bank in the settlement and/or liquidation of any of the assets retained by it as aforesaid, or sustained from undisclosed or increased liabilities, contingent or otherwise, existing at the date of the adoption, ratification and approval of this agreement by the Board of Directors and stockholders of said Bank and the State Banking authorities. Said trust shall continue, unless sooner exhausted by the application of the trust assets as aforesaid, for five years from the date of consummation of this agreement, at which time it shall be terminated and the trust fund shall thereupon be liquidated in the manner provided in said agreement and distributed to the holders of said beneficial interest certificates; subject first, however, to the payment of a sufficient amount or amounts to the directors who purchase and deposit stock of the Madison Square Safe Deposit Company, under the terms of the Directors' Trust referred to herein, as shall equal annual dividend payments on said trust until said final termination. Said trust may also be terminated before the expiration of said five years from the date of the adoption, ratification and approval of this agreement by the Board of Directors and stockholders of said Bank and the State Banking authorities, at the instance of

said Trustees with the approval and consent of the Chairman of the Board, and President of the Bancorporation, and the President of the Bank.

"(4) At the expiration of two years from the date of the adoption, ratification and approval of this agreement by the Board of Directors and stockholders of said Bank and the State Banking authorities, the undersigned directors shall appoint one appraiser and the Bank shall appoint one appraiser and these two appraisers shall then examine and appraise all of the assets retained or substituted therefor as above provided which are still so owned, upon the date of said appraisal, by the Bank. In case of disagreement, both of said appraisers shall appoint a third appraiser to act as umpire. If said appraisers shall find from an examination and appraisal of said assets as aforesaid, that any of said assets represent losses at the time or include assets which are undesirable from the standpoint of being continued as assets of said Bank, said appraisers shall immediately report their findings and conclusions to said Directors, the Bank, and the Trustees, and thereupon said findings of said appraisers shall become final and conclusive, for the purpose of fixing and establishing the extent to which said trust assets shall be applied under the terms of said trust agreement.

"(5) The trust agreement creating the Directors' Trust referred to in sub-paragraph (g) in paragraph (2) hereinabove shall contain substantially the following provisions: The Trustee shall have authority to transfer said stock into its name or into the name of its nominee with the exception of such shares as shall be required to stand in the name of directors for purpose of their qualification, which said shares shall be endorsed in blank and held by the Trustee. The Bank shall have power to vote all of said stock and the Trustee shall be directed to issue proxies or vote said stock

# ERRATUM

## 307 ILLINOIS APPELLATE

In printing this Volume, the order of pages 621 and 622 was reversed.

in accordance with the instructions of said Bank. Upon notice by said Bank that there is a deficiency in the assets of the Stockholders' Trust to cover losses sustained by the Bank as aforesaid, the Trustee shall sell all of the stock so held, at public or private sale, upon giving sixty days' notice thereof to said depositors of said stock for the best price and terms of payment possible and from the proceeds thereof pay to said Bank the amount of any such deficiency as aforesaid and the balance of said proceeds, if any, shall be retained in said trust for the further uses and purposes thereof. In the event said Bank shall become the purchaser at such sale, it shall be entitled to deduct from the purchase price thereof, the amount of any such deficiency as aforesaid. The trust shall continue, unless sooner exhausted by the application of the assets, or unless the covered losses shall be sooner established and paid as above provided, for five years from the date of the adoption, ratification and approval of said agreement by the Board of Directors and stockholders of said Bank and the State Banking authorities, at which time the trust shall terminate and the stock and/or the proceeds thereof, if any, shall be transferred and distributed to the then beneficiaries of said trust.

''(6) In the establishment of losses, the values of the respective retained assets and the amounts of the respective adopted liabilities shall be based upon an agreed statement of the assets and liabilities of the Bank to be deposited with the respective trustees. The action of the Bank in establishing losses by sale or settlement of assets and/or settlement of liabilities shall be binding and conclusive on all parties.

''(7) It is understood and Bancorporation reserves the right to cancel this agreement if, at or before the consummation hereof, the condition of said Bank shall be substantially altered from its present condition as

reflected by the audit of its books. It is understood that said Bank shall not declare nor pay any dividends after the consummation of this agreement.

"(8) It is further expressly understood and agreed that the Directors shall proceed at once to give the necessary notices and call the necessary meetings of the Board of Directors and stockholders of said Bank to adopt, ratify and approve this agreement and any and all action taken or to be taken necessary to make same fully effective according to the terms and conditions thereof; and to carry out their covenants herein to the end that this agreement may be consummated at the earliest time possible."

21. That on August 15, 1930, at a meeting of the board of directors of Bancorporation, a resolution was approved authorizing the exchange of stock of Bancorporation for Madison Square State Bank stock in accordance with the agreement of August 11, 1930.

22. That thereafter a written agreement and lease were executed, which were as follows:

## "Directors Trust

"This Agreement, made and entered into September 15, 1930, by and between Nelson K. Reese, H. A. Sellen, John T. Cunningham, Byron C. Thorpe, O. C. Braese, Harold C. Strotz, Peter L. Evans, Fred M. Georgs, John A. O'Keefe, Henry D. Cheney, and R. A. Schiewe, who are directors and stockholders of Madison Square State Bank, an Illinois corporation (hereinafter designated as 'Stockholders'), and Chicago Trust Company, an Illinois corporation (hereinafter designated as 'Trustee'), Witnesseth That:

"Whereas, the Stockholders desire to sell certain shares of capital stock of Madison Square State Bank to National Republic Bancorporation, a corporation (hereinafter designated as 'Bancorporation') and

"Whereas, an examination and investigation of the assets of the Madison Square State Bank would, in the

opinion of the officers and directors of Bancorporation, indicate that a certain amount of the said assets are now undesirable assets or may become undesirable assets in the future, resulting in either instances in losses to the Madison Square State Bank, and

"Whereas, Bancorporation is unwilling to buy said stock of Madison Square State Bank on any basis, terms or conditions unless and until it be properly secured and indemnified against any losses that may be sustained by Madison Square State Bank, and

"Whereas, by a certain agreement of trust known as and hereinafter referred to as 'Stockholders Trust', dated the 15th day of September, 1930, Madison Square State Bank has transferred, conveyed and assigned certain of the assets of Madison Square State Bank to John T. Cunningham, Nelson K. Reese, and R. A. Schiewe as trustees to indemnify said Bank against any losses that may be sustained by it on account of any of such undesirable assets; and whereas said assets so held by said trustees may be insufficient to indemnify said Bank against all losses that may be sustained on account of undesirable assets, and the Stockholders have agreed to further indemnify said Bank by the creation of this trust fund on the terms hereof.

"Now, Therefore, in consideration of the premises and in further consideration of the sale of said stock by stockholders to Bancorporation as aforesaid, it is mutually covenanted and agreed that:

"(1) Stockholders hereby sell, transfer and assign to Chicago Trust Company, as trustee nevertheless, 200 shares of the common capital stock of the Madison Square Safe Deposit Company, a corporation, of the par value of $100 per share, of which said shares Stockholders are the owners individually and severally, which said stock shall be held by the Trustee for the uses and purposes and subject to the terms and conditions herein set forth.

"(2) A copy of the trust agreement creating the above mentioned Stockholders Trust is attached hereto and made a part hereof for the purpose of advising the Trustee as to the manner in which the losses of the Madison Square State Bank are to be established and determined for the purpose of receiving the benefit of the provisions of this trust agreement. Upon receipt by the Trustee hereunder of a demand from the Madison Square State Bank for the payment to it of any sum or sums to reimburse it for losses sustained as established in accordance with the terms of said Stockholders Trust when accompanied by a certificate as hereinafter provided, the Trustee shall thereupon pay to said Bank the amount of such demand or demands out of the trust funds held by it hereunder or to the extent that such trust funds shall apply.

"The Trustee shall require, before payment of any demand as above provided, a certificate executed by the President or a Vice President, and the Cashier of said Bank, verified by their oath, setting forth the manner in which the losses claimed were incurred; that said losses have not been reimbursed by funds from the Stockholders Trust or from any other source and that the entire trust funds of said Stockholders Trust have been exhausted in the satisfaction of other losses of said Bank in accordance with the terms of said Stockholders Trust. In the event that the demands of said Bank are based upon losses established by the appraisers provided for in said Stockholders Trust, then said certificate shall be accompanied by the certificate of said appraisers establishing the amount of said loss. In the event that the demands of said Bank are based upon losses not established by appraisers acting under the provisions of said Stockholders Trust, then said certificate shall be accompanied by the certificate of appraisers appointed in the manner hereinafter provided, establishing the amount of such losses.

"If an appraisal is required as last above provided, the Bank shall appoint one appraiser and the Trustee

shall appoint one appraiser. If these two appraisers cannot agree upon the amount of losses for which said Bank is entitled to reimbursement hereunder, then said two appraisers shall appoint a third appraiser and the certificate of any two of said three appraisers shall be conclusive upon and full protection to the Trustee in acting pursuant thereto.

"(3) In the event that at the time demand shall be made upon the Trustee by the Bank for the payment of losses as above provided, the Trustee shall still be holding the stock deposited hereunder, it shall thereupon proceed to sell said stock at public sale after at least sixty days' notice of the time and place of such sale shall have been given to said Stockholders or their assigns, being then beneficiaries hereunder, by written notice, mailed to their last known address. At such sale the Trustee, the Bank, the Stockholders or any of them or their respective representatives may become purchasers of the stock.

"(4) The net proceeds received by the Trustee upon the sale of said stock, whether upon such public sale or other sale, as herein provided, and/or any other cash funds received by the Trustee as dividends or otherwise and held by it hereunder (except dividends upon said stock paid out of earnings of the corporation) shall be applied by the Trustee; first, to the payment and satisfaction of any and all demands of the Madison Square State Bank for reimbursement of losses as above provided; second, after the full payment and satisfaction of the demands of said Bank, then the remaining trust funds shall be paid over and distributed to the Stockholders or their assigns, according to their respective beneficial interest hereunder.

"(5) This trust shall terminate:

"(a) Upon the payment of demands of said Bank and the distribution of the remainder of funds, if any, to the beneficiaries hereunder.

"(b) At any time upon a written direction executed

by the Chairman of the Board and the President of National Republic Bancorporation, the President or a Vice President of Madison Square State Bank and at least six of the stockholders or their assigns, being then beneficiaries hereunder, and the Trustee shall thereupon dispose of the trust estate as shall be provided in said direction, provided, however, that any funds or assets payable or distributable to the beneficiaries hereunder shall be paid and distributed proportionately in respect to their respective interests.

"(c) In any event at the expiration of five years from the date hereof, at which time if the trust shall not be sooner distributed, Trustee shall forthwith distribute all funds and assets not required for the payment of any unpaid demand of the Bank as hereinabove provided, to the Stockholders or their assigns, then beneficiaries hereunder, in proportion to their respective interests.

"(6) The Trustee may cause all of the stock deposited hereunder to be transferred into its name or the name of its nominee, except directors' qualifying shares. The Trustee shall vote all of the stock deposited hereunder as directed in writing by said Bank, and shall issue or cause to be issued proxies in accordance with the direction of said Bank.

"(7) Trustee shall distribute all dividends received by it upon the stock paid out of earnings of the corporation to the beneficiaries hereunder in proportion to their respective interests, making such adjustment as may be necessary by reason of dividends received by them upon directors' qualifying shares.

"(8) The beneficial interest of said Stockholders hereunder is, at the creation of this trust, a one-eleventh interest in each of said eleven stockholders.

"(9) The Trustee shall be entitled to its reasonable compensaton for its services hereunder and for reimbursement of all its proper expenditures incurred in the administration of this trust, and shall have a lien upon the stock deposited hereunder and upon any

and all proceeds. or avails thereof for such fees and expenses, and may deduct the same before making any payment or distribution from the trust funds.

"Trustee is authorized to employ agents and attorneys in and about the administration of this trust and shall not be responsible for the default or misconduct of any such agent or attorney if selected by it with reasonable care, nor shall the trustee be liable for any error of judgment or for any act done or omission to act, if such shall be done in good faith, nor for anything whatsoever except for its own wilful misconduct.

"No person or persons dealing with the Trustee shall be obliged to see to the application of any money or property paid to or delivered to the Trustee, or to inquire into the propriety of the Trustee's exercise of authority or discretion hereunder.

"Unless herein specifically otherwise provided, a writing executed by the President or a Vice President, and the Cashier of Madison Square State Bank shall be deemed by the Trustee to be the proper act or direction of said Bank.

"In Witness Whereof, parties have hereunto set their hands and seals on the day first above stated.

"Fred W. Georgs (Seal)   Peter L. Evans (Seal)
"Henry A. Sellen (Seal)   Henry D. Cheney (Seal)
"Jno. A. O'Keefe (Seal)   Robert A. Schiewe (Seal)
"Nelson K. Reese (Seal)   Harold C. Strotz (Seal)
"Byron C. Thorpe (Seal)   Otto C. Braese (Seal)
"John T. Cunningham (Seal)
"(Corporate
Seal)

"Chicago Trust Company
"By W. F. Hopkins
"Vice President

"Attest: Burt A. Bowlby
"Assistant Secretary"

(Here follow a copy of the agreement of September 15, 1930, and a copy of the lease, of the same date, be-

tween Madison Square Safe Deposit Company and Madison Square State Bank, by the terms of which Madison Square Safe Deposit Company leased the bank building to Madison Square State Bank, lessee, and banking equipment, for term of five years commencing September 15, 1930, lessee to pay lessor $15,000 per year as annual rental, payable in monthly instalments of $1,250, and lessor grants to the lessee option to purchase premises for $210,000 during the term of the lease.)

23. That although the transaction purported to be evidenced by the written agreements of August 11, and September 15, 1930, and the written lease, which was dated September 15, 1930, was in form a purchase by defendants from Madison Square State Bank of all the capital stock of Madison Square Safe Deposit Company for $210,000 cash, the real transaction and the intent of the parties to said agreement as well as of The National Bank of The Republic, were that Madison Square Safe Deposit Company, which owned the building in which Madison Square State Bank conducted its business, was immediately upon the execution of said documents to become a subsidiary, branch and affiliate of The National Bank of The Republic and Bancorporation, and that it was never the intention of any of the parties that said stock of the Madison Square Safe Deposit Company should be the property or stock of defendants, or any of them.

24. That at the time The National Bank of The Republic and Bancorporation commenced to negotiate with defendants to acquire the controlling interest in Madison Square State Bank, the assets of Madison Square State Bank, representing its capital, surplus and undivided profits, consisted largely of real estate and slow, uncollectable and undesirable assets, and that as a part of the proposed acquisition by The National Bank of The Republic and Bancorporation of the controlling interest in Madison Square State

Bank, The National Bank of The Republic and Bancorporation stipulated that the capital of Madison Square State Bank be reduced from $300,000 to $200,000, the surplus reduced from $100,000 to $50,000, the undivided profits be reduced $50,000, and that there be set aside certain assets representing the aforesaid $100,000 reduction in capital, $50,000 reduction in surplus, and $50,000 reduction in undivided profits and reserve, and further stipulated that said assets be transferred to defendants Cunningham, Reese and Schiewe, as trustees, pursuant to the terms of the written agreement of August 11, 1930, and the so-called Stockholders' Trust dated September 15, 1930.

25. That The National Bank of The Republic and Bancorporation represented to defendants that it was further necessary, in order to put Madison Square State Bank in a sound liquid condition, that the stock of the Madison Square Safe Deposit Company, owner of the bank building, premises and contents, which stock was carried on the books of Madison Square State Bank at a value of $210,000, be removed from the assets of Madison Square State Bank and liquid assets substituted therefor; that The National Bank of The Republic and Bancorporation refused to acquire and take over the controlling interest in Madison Square State Bank unless the aforesaid stock of Madison Square Safe Deposit Company was removed from the assets of Madison Square State Bank; that thereupon The National Bank of The Republic and Bancorporation represented to defendants that the procedure whereby said assets could be removed and liquid assets substituted therefor without defendants' incurring any liability would be for defendants to execute a note payable to The National Bank of The Republic, the proceeds of which would be ostensibly used by defendants to purchase stock of Madison Square Safe Deposit Company from Madison Square State Bank, but The National Bank of The Republic and

Bancorporation further represented to defendants that the entire transaction concerning the purported purchase by defendants of the stock of the Madison Square Safe Deposit Company from the Madison Square State Bank and giving of the note was a purely formal transaction and defendants would not be required to pay the note, and that the entire transaction, including the giving of the purported note in question and the issuance to defendants of a purported check, ostensibly representing the proceeds of the said note, as well as the purported sale of the stock of the Madison Square Safe Deposit Company to defendants for $210,000, was a device to aid and assist The National Bank of The Republic and Bancorporation to acquire the controlling interest in the Madison Square State Bank and to place Madison Square State Bank as of the date of the aforesaid acquisition in a liquid condition satisfactory to the Illinois State Bank Examiner without defendants' incurring any obligation by reason of the said transaction or the pretended note.

26. That defendants never received any cash proceeds of the note or anything of any value whatsoever on account of said note and that on August 12, 1930, The National Bank of The Republic issued a certain purported check to the order of defendants in the amount of $210,000, ostensibly as the proceeds of said note.

27. That the check was never delivered to defendants, but that on August 12, 1930, they indorsed the check, which continuously remained in the possession of The National Bank of The Republic and Bancorporation until September 29, 1930, at which time The National Bank of The Republic credited said check, or the proceeds thereof, to the account which Madison Square State Bank had on that date with The National Bank of The Republic; that on September 15, 1930, Carl F. Kuehnle, Jr., who on and prior to that date had been a vice president of The National

Bank of The Republic, was elected vice president of Madison Square State Bank; that on November 2, 1930, Kuehnle was elected president of said Madison Square State Bank after the resignation of the then president, defendant Schiewe; that the $210,000 was used by Madison Square State Bank exclusively for the purposes of the bank under the direction of Kuehnle, and that none of the same was given, credited to or used for or by any of the defendants.

28. That pursuant to the conspiracy, after the acquisition of the controlling interest in Madison Square State Bank by The National Bank of The Republic and Bancorporation, Madison Square State Bank was maintained and conducted as a branch bank, branch office, additional office and agency for the purpose of conducting the business of The National Bank of The Republic, and after such acquisition Bancorporation, through its ownership of the controlling interest in the Madison Square State Bank, further engaged in the banking business in the State of Illinois.

29. That pursuant to the said conspiracy, The National Bank of The Republic and Bancorporation made further efforts to acquire the controlling interest in other outlying banks in the City of Chicago.

30. That The National Bank of The Republic and Bancorporation caused uniform checks for the aforesaid branch banks to be adopted, caused a Mortgage Committee to be appointed by Bancorporation to approve all mortgage loans of said branches, and caused uniform trust deeds and mortgage notes to be prepared by Bancorporation for the aforesaid branch banks, and in further pursuance of the conspiracy, in January, 1931, caused a collective advertising program for all of the banks to be handled by the advertising department of The National Bank of The Republic, and caused electrical signs showing affiliation with Bancorporation to be placed on the various branch banks heretofore mentioned.

31. That after The National Bank of The Republic and Bancorporation had acquired the controlling interest in the aforesaid and other banks and other institutions, they secured various blanket bonds insuring Bancorporation and The National Bank of The Republic and the aforesaid branch banks and other corporations and companies (terms of which are set forth in the plea).

32. That after The National Bank of The Republic and Bancorporation acquired the controlling interest in the aforesaid banks, they dominated the dividend paying policies of the banks and prorated the office expenses of the aforesaid banks, dominated the policies of said banks regarding the repurchase of mortgages theretofore sold by said branch banks, supervised and dictated the publicity and advertising matter issued by said branch banks, supervised their investment departments, and caused approximately one-half million dollars of the fund of The National Bank of The Republic to be transferred to United American Trust and Savings Bank to assist it in connection with certain financial difficulties, and also caused Adams State Bank, Austin State Bank, Cosmopolitan State Bank, First Englewood State Bank, Madison Square State Bank, Peoples National Bank and Trust Company and Western State Bank to transfer approximately $200,000 of their liquid funds to aforesaid United American Trust and Savings Bank to further assist it in its financial difficulties.

33. That during the years 1930 and 1931 The National Bank of The Republic, contrary to the statutes of the United States and State of Illinois, established and maintained branch banks, branch offices, additional offices and agencies for the purpose of conducting its business, and during that period Bancorporation, although organized under the General Corporation Law of the State of Illinois, carried on the business of banking, contrary to the statute of the State of Illinois;

that during said period Bancorporation owned a con-. trolling interest in and operated The National Bank of The Republic and People's National Bank and Trust Company, contrary to the United States statutes pertaining to banks and banking; that the note executed by defendants was procured from them without any consideration and in pursuance and aid of and as an inseparable part of said unlawful conspiracy and confederation between The National Bank of The Republic, National Republic Investment Trust and National Republic Bancorporation and their officers, directors, trustees, agents, subsidiaries and affiliates, to maintain branch banks in the State of Illinois, contrary to the statutes of the United States of America and the State of Illinois, and said note was procured in aid of and in pursuance and as an inseparable part of the further unlawful conspiracy and confederation of said persons to engage in the business of banking through the medium of a holding corporation formed under the General Corporation Act of the State of Illinois, contrary to sec. 2, ch. 32, Cahill's Ill. Rev. Stats. 1929, as amended; and that said note was procured from defendants in aid and furtherance of the further unlawful conspiracy and confederation of said persons to own the controlling interest in and operate The National Bank of The Republic and the People's National Bank and Trust Company through the medium of Bancorporation, contrary to the United States statutes pertaining to Banks and Banking.

34. That the note was, at the time it was obtained, wholly void and unenforceable and the procurement of the same by The National Bank of The Republic was contrary to the public policy and the statutes of the United States and the State of Illinois.

35. That Chicago Trust Company knew all of the aforesaid facts prior to its procuring the note and was not a holder in due course; that when the Chicago Trust Company delivered the note to Central Republic

Trust Company, the latter well knew that the same had been made and executed under the circumstances hereinabove stated, and was not and is not a holder in due course; that said note was indorsed to Chicago Trust Company after the maturity thereof, and was likewise delivered to Central Republic Trust Company after the maturity thereof, and that the assignment of the judgment (obtained thereon by confession) to the alleged beneficial plaintiff was after the maturity thereof.

Subsequently the other defendants adopted this additional plea of defendant Cunningham.

Plaintiff joined issue on pleas I, II, III, and IV, traversed plea V, the additional plea, and filed a special replication, which avers that The National Bank of The Republic, at the time of the execution and delivery of the note in question, was organized and existing under the National Banking Law of the United States of America, and alleges that defendants were estopped from asserting the various matters and things set up in the additional plea.

In support of its claim plaintiff proved that on August 11, or August 12, 1930, the note in suit was signed by all of the defendants except Braese, Evans, O'Keefe and Strotz, who signed it between August 11, and September 3, 1930; that concurrently with the execution of the note, a cashier's check of The National Bank of The Republic in the sum of $210,000 was issued to defendants and was indorsed by all of them; that the note was delivered to the discount department of The National Bank of The Republic and a record was made by that bank of the note on the liability ledger of the bank; that the note was approved by H. E. Otte, vice chairman of the board of directors of The National Bank of The Republic, and the cashier's check was deposited to the account of Madison Square State Bank on September 29, 1930. Plaintiff introduced the agreement made August 11, 1930, between Bancorporation and the directors of Madison Square State Bank,

which is set forth in the additional plea of defendants. Plaintiff also introduced the trust agreement dated September 15, 1930, between Madison Square State Bank and John T. Cunningham, Nelson K. Reese and R. A. Schiewe, as trustees; and also the "Directors' Trust" agreement, of the same date, between Nelson K. Reese et al., directors and stockholders of Madison Square State Bank, and Chicago Trust Company. Plaintiff also introduced the minutes of the special meeting of the board of directors of Madison Square State Bank held August 15, 1930, which show that the contract dated August 11, 1930, was approved, and which also show a resolution that, subject to the approval of the stockholders, the capital stock of Madison Square State Bank be decreased from $300,000 to $200,000, and which also show the adoption of a resolution offered by defendant Georgs and seconded by defendant Cunningham, which authorized and directed the bank to sell, assign and deliver to the directors of the bank two hundred shares of stock of the Madison Square Safe Deposit Company owned by the bank, for the cash price of $210,000. The minutes also show a resolution offered by defendant Reese and seconded by defendant Cheney, that officers of the bank secure the approval of the State banking authorities to the actions of the board of directors taken at said meeting. Said minutes also show a call for a meeting of stockholders on September 15, 1930, for the purpose of considering the reduction of the capital stock of the bank. Plaintiff also offered the minutes of the special meeting of the stockholders of Madison Square State Bank held September 15, 1930, at which the reduction of the capital stock was approved and the various contracts entered into by the directors and the bank were approved. The minutes also show the adoption of a resolution approving the action of the board of directors at the meeting of August 15, 1930, in respect to the sale by the bank of two hundred shares of stock of Madison

Square Safe Deposit Company to the directors of the bank as individuals for a cash price of $210,000. Plaintiff also proved the assignment of the judgment by confession entered February 7, 1933, from Central Republic Trust Company to Reconstruction Finance Corporation on November 24, 1933; also the pledge of the note by Central Republic Trust Company to Reconstruction Finance Corporation on June 27, 1932.

The trial court allowed defendants to introduce evidence in support of their defense that the execution of the note was part of an illegal scheme to permit Bancorporation to engage in the banking business in violation of the general incorporation laws of the State of Illinois, and defendants claim that the said evidence shows that the control and operation of the various unit banks mentioned in defendants' additional plea was such as to destroy the legal entities of the said banks and that Bancorporation was in fact engaged in the banking business in violation of the general incorporation laws of the State of Illinois. Plaintiff then offered evidence as to the degree of control exercised by Bancorporation over the said banks, and it contends that when the entire evidence bearing upon the subject is considered it appears that the control of the said unit banks by Bancorporation was nothing more than the control that a majority stockholder of a corporation might lawfully exercise. At the close of defendants' evidence in chief and again at the close of all of the evidence plaintiff formally moved for a directed verdict in its favor. These motions were overruled and defendants' motion for a directed verdict in their favor was allowed. The court, in passing upon all of the motions, stated that the evidence showed that Bancorporation had the absolute power and control over the said unit banks. It would appear that the trial court considered that this finding determined the rights of the parties and entitled defendants to a directed verdict in their favor.

A number of contentions are raised by plaintiff, but in our view of this appeal it is only necessary to consider one: Defendants contended in the lower court and contend here that "the note sued upon was given in pursuance of and as a part of an illegal scheme to violate Section 2 of the Illinois Corporation Act;" that "in pursuance of an unlawful conspiracy, National Republic Bancorporation was engaged in the banking business contrary to Section 2 . . . , and the note sued upon was given in pursuance of the conspiracy;" that defendants proved the existence of the unlawful conspiracy and, therefore, plaintiff cannot recover; also, that the note was given in pursuance of an unlawful conspiracy to violate the public policy of the State of Illinois, and is therefore uncollectable. While plaintiff strenuously argues that the evidence does not show that Bancorporation was engaged in the banking business, it contends that even if it be assumed that it was so engaged, nevertheless, plaintiff, under its proof, made out a clear *prima facie* case against defendants; that the defense interposed by defendants is based upon an alleged illegal conspiracy between themselves and Woodruff, by means of which $210,000 of the funds of The National Bank of The Republic was illegally obtained, and that the law will not permit defendants to interpose such a defense to defeat plaintiff's clear right of action; that the alleged promise of Woodruff to defendants is a void promise and not binding upon that bank. We are in full accord with plaintiff's contention.

Defendants' defense and certain uncontroverted evidence show the following: Madison Square State Bank was located at 4812 West Madison street. The makers of the note in suit were its directors; some of them were its officers. They were all men of extensive experience in banking and other businesses. John T. Cunningham was a director of the Reliance Bank & Trust Company and president of the Cunningham Ice

Cream Company. Henry A. Sellen was president of the Morgan Sash and Door Company and a partner in the real estate firm of Sellen & Johnson. Byron C. Thorpe, an attorney for many years, was connected with the Cicero Trust & Savings Bank and the Twelfth Street Bank, was president of the Berwyn Trust & Savings Bank, and was active in the operation of these banks. Henry D. Cheney was a member of the law firm of Cheney & Evans, which represented a number of banks in Chicago. Nelson K. Reese was a director of West Town and Ridgeway Banks. Fred W. Georgs was engaged in the real estate mortgage business, was vice president of Madison Square State Bank and a director of United American Trust & Savings Bank. Prior to the incorporation of the last mentioned bank he had been vice president of the Home Bank & Trust Company. Peter L. Evans, a prominent attorney for many years, had represented a number of banks in that city. John A. O'Keefe was president of O'Keefe Brothers Company. Robert A. Schiewe at the time of the signing of the note was president of Madison Square State Bank. None of the defendants was hurried into signing the note. Prior to its execution defendants had knowingly and willingly entered into the alleged conspiracy, and they understood that by signing the note and indorsing the cashier's check issued to them, $210,000 of the funds of The National Bank of The Republic would come into the possession of the Madison Square State Bank, to be used by them, as directors of that bank, in purchasing the capital stock of the Madison Square Safe Deposit Company in order to bolster up the financial condition of Madison Square State Bank. They knew that all of these transactions were steps in furtherance of the alleged conspiracy, and, so understanding, they used the $210,000 in the purchase of the capital stock of the Madison Square Safe Deposit Company. All of the records of The National Bank of The Republic in ref-

erence to the note disclose an ordinary commercial transaction. After the defendants had signed the note and it had been approved by a vice president of the bank and the discount department of the bank had made a record of the note on the liability ledger of the bank, a cashier's check of the bank was issued to defendants and was by them indorsed. The cashier's check was then deposited in the said bank to the account of Madison Square State Bank, on September 29, 1930, was checked out by that bank, and, as we have heretofore stated, was used by it, through its directors, the defendants, in furtherance of the alleged conspiracy. At the time of the execution of the note defendants delivered to The National Bank of The Republic statements of their financial condition, which contained the following: ''For the purpose of borrowing money and procuring credit from you from time to time, the undersigned makes and delivers to you the following financial statement and information, which is a full, true and accurate statement of the current and fixed assets, the current and fixed liabilities and financial condition and responsibility of the undersigned on the 11th day of August, 1930; which you are to consider as continuing to be full, true and accurate until the undersigned has delivered to you written notice of change. The undersigned agrees to notify you promptly in writing of any change that materially reduces the financial responsibility of the undersigned as herein set forth.'' It may be further added that the agreement of August 11, 1930, was filed with the auditor of public accounts of the State of Illinois. So far as *the records* of The National Bank of The Republic disclose, everything in reference to the note was in writing. But defendants contend that in addition to the written record there must also be considered the alleged oral agreement made by Woodruff with defendants that the execution of the note by defendants was a mere matter of form and that de-

fendants would not be called upon to pay the note, and that he, Woodruff, and The National Bank of The Republic and Bancorporation *"would at a future time cause the said Madison Square State Bank to repurchase the said capital stock of the said Madison Square Safe Deposit Company, and that the said pretended note would be paid out of the proceeds of such repurchase."* Solely for the purpose of considering the instant contention of plaintiff, we will assume that Woodruff made the alleged statements to defendants and that in furtherance of the alleged conspiracy defendants executed the note.

As to the argument of defendants that the note cannot be enforced because it was given in pursuance of and as a part of the illegal scheme alleged in defendants' additional plea: Plaintiff is not suing to enforce an illegal contract but is suing on a promissory note complete in itself. It is the defendants who seek to interpose the alleged illegal conspiracy as a defense to the clear *prima facie* case made out by plaintiff. In *Teich v. City of Chicago,* 298 Ill. 498, 501, the court said: "Although, in fact, equally culpable with appellant, appellee was entitled to recover if he could show that right without relying on and proving the illegal contract set up in the special plea. He could not have recovered if he had had to rely on and prove the illegal and void contract set up in the special pleas. A party to such an illegal contract cannot recover by proving such illegal contract and the carrying out of the same by him, for the simple reason that courts will not lend their sanction and aid to such illegal contracts by allowing one to recover thereon. (*Kearney v. Webb,* 278 Ill. 17.) In a case where such a party can show a right of recovery without relying on the illegal contract and without having the court sanction the same he may recover in any appropriate action. It is also well established that the defendant cannot defeat the plaintiff's right of action by setting up the illegal

contract, which was really the actual foundation of plaintiff's claim." (See, also, *Pitsch v. Continental Bank*, 305 Ill. 265; *Lamb v. Fidelity & Deposit Co.*, 257 Ill. App. 262, 277; *Armstrong v. American Exchange Bank*, 133 U. S. 433, 469; *In re T. H. Bunch*, 180 Fed. 519.)

Our Supreme Court has always carefully guarded the "well being" of banks. To quote from a recent decision: "Banks are quasi-public institutions. Their well being concerns not only the stockholders but the depositors and the public at large. (*Knass v. Madison and Kedzie Bank, supra* [354 Ill. 554].)" (*People v. Wiersema State Bank*, 361 Ill. 75, 87.) In the *Knass* case it was held that a bank's agreement to repurchase at a specified price real estate mortgage bonds sold by it is void as against the public policy of the State as evidenced by section 4 of the Act of 1879 for the protection of bank depositors, as such an agreement may jeopardize or impair the deposits or trust funds of the bank, resulting in injury to depositors and the public. In that case there was not present an illegal scheme such as defendants claim is present in the instant case; indeed, the agreement in the *Knass* case was made in good faith and without any intent to act in derogation of the law, but the plaintiffs' cause of action failed because they were seeking to recover upon an agreement that the Supreme Court held to be a void agreement. In the instant case Woodruff was utterly without power to bind the bank by the alleged promises made by him to defendants and which the latter claim were made in furtherance of the alleged conspiracy. The said promises, so far as the bank was concerned, would be clearly against public policy and void (see *Knass* case, *supra*). There is nothing in the record to show that the board of directors authorized Woodruff to make the alleged promises. But even a resolution of the board of directors authorizing the promises could not bind the bank. Defendants, experienced

bankers, knew, or should have known, that the alleged promises of Woodruff were, as to the bank, void, and could not absolve them from the payment of the note. The note is a valid instrument upon its face and its validity is not changed by the void promises of Woodruff. The defense interposed, assuming it to be based upon facts, is entirely devoid of equity, and it would be a serious reflection upon the administration of justice if the participants in an illegal conspiracy could, in furtherance of said conspiracy, obtain $210,000 of the funds of the bank by means of a note, valid upon its face, which funds were used for the purpose of bolstering the financial condition of Madison Square State Bank, which defendants controlled, and be absolved from the payment of the note. To adopt defendants' position would be to penalize the innocent stockholders, depositors, and creditors of the bank, in order to protect the guilty participants in the alleged illegal scheme. If defendants' theory of law is sound, then Woodruff had the power to dissipate the entire cash assets of the bank by means of conspiracies akin to the one alleged by defendants, and the bank would have no redress against the guilty conspirators. In this connection it must be noted that in furtherance of the alleged conspiracy of Woodruff and defendants the latter placed in the bank an instrument purporting on its face to be a promissory note, which they knew would be held out to the national bank examiners to be an ordinary promissory note and an asset of the bank. Defendants, at the time of the execution of the note, also delivered to the bank statements of their financial condition, which they well knew would be considered by the examiners in determining the value of the note as an asset of the bank. That the rule defendants seek to have sanctioned would work against the "well being" of the bank, as defined in the *Knass* case, is obvious. How long would banks retain the confidence of the public if defendants' contention as

to what constitutes the public policy of the State were sustained?

The fact that The National Bank of The Republic was a federal bank in no way changes the situation, as the Supreme Court of the United States has held that the policy of the National Banking Act is to promote the security and strength of the national banking system.

Defendants contend that there was no valid consideration for the note and therefore there is no liability upon the note. From what we have heretofore stated it is clear that there is no merit in this contention.

We hold that the circuit court of Cook county erred in directing a verdict for the defendants, and we further hold that the court erred in not directing a verdict for plaintiffs.

Certain of the defendants have heretofore filed a motion in this court that the appeal of plaintiff be dismissed, or, in the alternative, that the appeal be stricken from the docket of this court. This motion, which was reserved to the hearing, is denied *in toto*.

The judgment entered by the circuit court of Cook county on April 27, 1936, setting aside the judgment by confession theretofore entered, on February 7, 1933, is reversed, and the said judgment by confession entered February 7, 1933, in favor of plaintiff and against defendants in the sum of $245,811.25 is confirmed.

*Judgment entered April 27, 1936, setting aside judgment by confession entered February 7, 1933, reversed; and judgment by confession entered February 7, 1933, in favor of plaintiff and against defendants in the sum of $245,811.25, confirmed.*

FRIEND, P. J., and JOHN J. SULLIVAN, J., concur.